**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

                    v.

MORNINGSTAR CREDIT RATINGS, LLC,

                                        Defendant.

---

21-CV-1359 (_____)

**COMPLAINT**

**ECF CASE**
**JURY TRIAL DEMANDED**

Plaintiff United States Securities and Exchange Commission (the "SEC") files this

Complaint against Defendant Morningstar Credit Ratings, LLC, and alleges as follows:

**SUMMARY**

1.      Few private entities play a more important role in maintaining market integrity

than credit rating agencies.  Credit ratings are used by market participants to help evaluate credit

risk, to price debt securities, and to guide the investment decisions of individuals and

institutional investors alike.  This includes the investment decisions of pension funds and

insurance companies, both of which use credit ratings to help assess the riskiness of their

investments.

2.      Entities that issue rated securities pay the credit rating agency to assign a rating.

These issuers can thus be motivated to hire a rating agency that provides their securities with the

highest rating, because the interest rates they pay to investors are typically lower for higher-rated

securities.  When credit rating agencies depart from a disciplined and transparent approach to

determining credit ratings, the effects for the markets can be harmful.

3.      To guard against this risk to the markets and to promote transparency, the federal

securities laws require that credit rating agencies registered with the SEC publicly—and

accurately—describe the procedures and methodologies used to determine credit ratings and implement effective internal controls to ensure that credit ratings agencies follow those procedures and methodologies.

4.      From at least 2015 through 2016, Morningstar Credit Ratings, LLC ("Morningstar") rated approximately $30 billion in commercial mortgage-backed securities ("CMBS") from 30 transactions.  In determining those ratings, Morningstar used its CMBS Subordination Model ("Subordination Model"), which it publicly described as a "critical component of Morningstar's credit rating process."

5.      Morningstar's public disclosures described how Morningstar used its underwriting process to determine key cash flow and valuation amounts for the commercial properties and associated loans backing each CMBS transaction, then further explained how its Subordination Model stressed those amounts to project expected loan losses in differing economic environments.  But Morningstar failed to disclose that its CMBS rating methodology permitted its analysts to adjust those stresses on a "loan-specific" basis in the Subordination Model.  This omission was material:  a 2017 internal review of the stress adjustments—prompted by a concern from a Morningstar employee regarding the "integrity and appropriateness of the adjustments"—described the adjustments as a "central feature" of the Subordination Model.

6.      Although the adjustments were used to both increase and decrease property cash flow and valuation stresses, the adjustments were overwhelmingly used to ease those stresses, which lowered expected losses for many classes of CMBS certificates that Morningstar rated.  Those projected losses, expressed as a percentage of the total value of the CMBS certificates being issued, are the model-generated subordination levels, or credit enhancement, that

represents the amount of protection that lower-rated CMBS certificate classes provide the higher-rated tranches to protect against losses.

7.      By using the undisclosed adjustments, Morningstar often lowered the credit enhancement for many classes of certificates of the CMBS transactions that it rated.  This allowed Morningstar to assign higher credit ratings to those classes, to the benefit of the issuers that hired and payed Morningstar.

8.      Morningstar used one or both of the "loan-specific" stress adjustments in all 30 CMBS transactions that it rated during the relevant period, and the adjustments caused Morningstar to assign one or more higher ratings in at least one class of certificates in the vast majority of those transactions.  Morningstar also used the stress adjustments in many of these transactions to rate millions of dollars of CMBS as investment-grade securities, when Morningstar would have rated those securities as below-investment-grade had Morningstar rated the CMBS in accordance with its disclosed methodology.

9.      In addition to failing to disclose the stress adjustments, Morningstar failed to establish and enforce an effective internal control structure governing the adjustments in at least 31 CMBS transactions, including an additional transaction in March 2017.

10.      Specifically, Morningstar's internal control structure relating to the determination of CMBS ratings omitted elements designed to assess whether its analysts appropriately implemented the "loan-specific" stress adjustments.  Morningstar thus lacked effective internal controls to ensure that its analyst employed the "loan-specific" adjustments for loan-specific reasons, instead of another reason.  For instance, Morningstar's written methodology for determining CMBS ratings omitted any criteria whatsoever for how, why, or when to make these

"loan-specific" stress adjustments, nor did it require its analysts to even document why those adjustments were made.

11.     The lack of effective internal controls resulted in Morningstar allowing its analysts to employ supposed "loan-specific" adjustments for reasons unrelated to the specific loans or individual properties securing those loans.  Morningstar's corporate representative said that Morningstar's analysts could use the undisclosed "loan-specific" stress adjustments for subjective reasons, including as a means to bring a particular CMBS transaction's rating in line with expectations based on similar deals.  And Morningstar stated as late as November 2020 that there was "nothing inappropriate" about doing so.

12.     Equally troubling, Morningstar sometimes used these adjustments, which its Subordination Model stated were "loan-specific," on a portfolio-wide basis, meaning that Morningstar used the same stress adjustment at particular ratings categories for each of the 100 or so loans in a CMBS transaction portfolio.  This was thus inconsistent with Morningstar's methodology stating that the adjustments were to be "loan-specific."

## <u>VIOLATIONS</u>

13.     Congress enacted and later amended Section 15E of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o-7], to require national credit ratings agencies to, among other things, (1) submit annual information to the SEC regarding the procedures and methodologies used to determine ratings [15 U.S.C. § 78o-7(b)(2)(A)]; and (2) establish and enforce internal controls to ensure that credit ratings agencies adhere to their methodologies [15 U.S.C. § 78o-7(c)(3)(A)].  The SEC enacted regulations to implement this statute, including by requiring credit ratings agencies to publicly describe their procedures and methodologies in annual regulatory filings, Rule 17g-1(f) [17 C.F.R. § 240.17g-1(f)], and disclose the version of

those procedures and methodologies used to determine each credit rating, Rule 17g-7(a)(1)(ii)(B) [17 C.F.R. § 240.17g-7(a)(1)(ii)(B)].

14.     Morningstar violated these provisions through its years-long actions and failures described in this Complaint.

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

15.     The SEC brings this action pursuant to the authority conferred upon it by Section 21 of the Exchange Act [15 U.S.C. § 78u].

16.     The SEC seeks a final judgment (a) permanently enjoining Morningstar from engaging in future violations of the federal securities laws; (b) ordering Morningstar to disgorge an amount equal to the profits gained as a result of the actions described in this Complaint, with prejudgment interest; and (c) ordering Morningstar to pay civil monetary penalties.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

18.     Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

19.     Venue is proper in this Court pursuant Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District.  Specifically, venue is proper because (1) Morningstar's principal place of business was located in this District; (2) Morningstar's regulatory disclosures that constitute a portion of the violations set forth in this Complaint were sent to the SEC by a Morningstar employee located in this District during the

relevant time period; (3) the inaccurate public descriptions of Morningstar's methodologies for determining CMBS ratings were available to users of credit ratings in this District.

## DEFENDANT

20.     **Morningstar Credit Ratings, LLC**, is a Pennsylvania limited liability company founded in 2007 with its principal place of business in New York, NY.  From 2008 through December 2019, Morningstar was registered with the SEC as a nationally recognized statistical ratings organization ("NRSRO").  From November 2019 through November 2020, Morningstar operated as a credit rating affiliate of DBRS, Inc., an NRSRO currently registered with the SEC. During this period, Morningstar's credit rating services and operations were integrated with those of DBRS, Inc. under the brand name DBRS Morningstar, which currently operates as an NRSRO through DBRS, Inc.  Both Morningstar and DBRS, Inc. are wholly-owned subsidiaries of Morningstar, Inc., a publicly traded company whose stock trades on the Nasdaq Global Select Market.

## STATUTORY AND REGULATORY FRAMEWORK

21.     Although credit rating agencies have existed for over a century, NRSRO regulation is relatively new.  Congress first authorized the SEC to establish a registration and oversight program for credit rating agencies in the Credit Rating Agency Reform Act of 2006 ("2006 Rating Agency Act").  Pub. L. No. 109-291, 120 Stat. 1327 (2006).  Among other things, the 2006 Rating Agency Act added Section 15E to the Exchange Act to establish registration and annual certification requirements for NRSROs [15 U.S.C. §§ 78o-7(a)-(b)].  Section 15E requires NRSROs to submit to the SEC and annually certify "information regarding . . . the procedures and methodologies that the applicant uses in determining credit ratings," and to make that same

information "publicly available on [the NRSRO's] website" or through other comparable means. [15 U.S.C. §§ 78o-7(a)(1)(B)(ii); 78o-7(b)(2); 78o-7(a)(3)].

22.     In June 2007, the SEC adopted rules to implement the NRSRO registration and oversight program set forth in the 2006 Rating Agency Act.  *See Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations*, 72 Fed. Reg. 33,564 (June 18, 2007).

23.     Among those rules was Exchange Act Rule 17g-1, which requires that NRSROs register with the SEC and publicly file and annually certify their registration documents, including a description of the procedures and methodologies that each NRSRO uses to determine credit ratings [17 C.F.R. § 240.17g-1].  Rule 17g-1(f) requires that the NRSROs' certifications be filed in accordance with the specified instructions, one of which directs NSRSOs to include a "general description of the procedures and methodologies used" by the NRSRO that is "sufficiently detailed to provide users of credit ratings with an understanding of the processes the applicant or NRSRO employs to determine credit ratings," including a description of "the quantitative and qualitative models used to determine credit ratings."  [17 C.F.R. § 240.17g-1(f); 72 Fed. Reg. at 33,634 (adopting Form NRSRO instructions)].

24.     Rule 17g-1 also requires each NRSRO to make its description of its procedures and methodologies "publicly and freely available on an easily accessible portion of its corporate Internet Web site."  [17 C.F.R. § 240.17g-1(i)].  In addition to the public description, Rule 17g-2(a)(6) requires each NRSRO to make and retain complete records of its established procedures and methodologies that it used to determine credit ratings.  [17 C.F.R § 240.17g-2(a)(6)].

25.     Shortly after adoption of these regulations, the 2008 financial crisis and the significant role credit rating agencies played in that crisis spurred the adoption in 2010 of

the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124

Stat. 1376 (2010) ("Dodd-Frank Act").  Rating agencies were a prime focus of the Dodd-Frank

Act, having come under criticism for the integrity of their ratings in the run-up to the crisis.  A

Senate report on Dodd-Frank attributed rating agencies' errors to conflicts of interest and an

overreliance on risk models based on inadequate data.  *See* S. Rep. No. 111-176, at 36 (2010).

Given the "gatekeeper" role NRSROs play in the debt market, Congress concluded that increased

public oversight and accountability was warranted.  *See* Dodd-Frank Act, 124 Stat. at 1872.

26.    Dodd-Frank thus increased regulatory oversight over NSRSOs, including by

amending Section 15E of the Exchange Act to require that each NRSRO establish effective

internal controls to ensure that the NRSRO adheres to its methodologies for determining credit

rating [15 U.S.C. § 78o-7(c)(3)(A)].  The SEC then adopted additional rules, including requiring

NRSROs to disclose the version of the rating methodology used to determine each credit rating

contemporaneously with the publication of that rating.  Rule 17g-7(a)(1) [17 C.F.R. § 240.17g-

7(a)(1)].

27.    Taken together, the 2006 Rating Agency Act, the Dodd-Frank Act, and the SEC's

implementing regulations require effective internal control structures and accurate disclosures to

ensure integrity in the ratings process and promote accuracy and transparency in credit ratings.

## FACTUAL ALLEGATIONS

### I.    CMBS Background and NRSRO Ratings Process

28.    This case involves Morningstar's ratings of a particular type of CMBS, known as

conduit/fusion CMBS.[1]  CMBS are securities, known as "certificates," which are issued by a

---

[1]  Conduit/fusion transactions typically combine a pool of commercial real estate loans with several large loans with investment-grade credit characteristics.

trust that holds a pool of mortgage loans secured by commercial real estate.  The commercial mortgage loans are the collateral for the certificates issued by the trust, and they are intended by the issuer to generate funds to pay the principal and interest on the certificates.

29.     CMBS transactions are created by "arrangers," typically investment banks, which earn profits by structuring, marketing, and selling the CMBS certificates.  The arranger creates an issuer, the trust that buys a pool of commercial mortgage loans and sells CMBS certificates that will be repaid from the cash flow from those loans.

30.     A crucial step in selling the CMBS certificates is obtaining credit ratings.  CMBS certificates can be rated in a wide variety of rating categories, including investment-grade rating categories (AAA, which is the highest rating available, through BBB-, which is the lowest investment-grade rating) and non-investment-grade rating categories (BB+ and below).[2]

31.     The credit rating agencies, three of which are typically hired for each CMBS transaction,[3] determine the amount of CMBS certificates they are willing to rate in any given rating category.  For example, an arranger might plan to sell $1 billion of CMBS certificates in three classes:  Class A, rated AAA; Class B, rated BBB-; and Class C, rated BB.  Credit rating agencies will determine how much of that $1 billion of CMBS certificates they will rate AAA, how much they will rate BBB-, and how much they will rate BB.  By determining how much of

---

[2]  Morningstar's credit ratings scale had 11 ratings categories (AAA, AA, A, BBB, BB, B, CCC, CC, C, SD (selective default), and D (default)) and could be modified by the addition of a plus (+) or a minus (-) sign to show relative standing within ratings categories.  Higher rating categories meant lower credit risk and a higher likelihood of repayment.  Morningstar defined a material difference in ratings as a difference of one or more letter-grade rating categories.

[3]  Three ratings agencies typically rate the highest-rated CMBS certificates (including AAA), while two rating agencies typically rate lower-rated certificates.

the CMBS transaction they rate AAA, BBB-, and BB, the credit rating agencies effectively determine the size of the classes.

32.     The key determinant of ratings (and thus class sizes) is subordination levels.  A subordination level is the percentage of the total CMBS certificates issued in the transaction that are rated below a given class of CMBS.  The existence of lower-rated CMBS certificates protects the investors in the higher-rated certificates because the higher-rated CMBS certificates suffer no losses unless and until the lower-rated CMBS certificates are wiped out by losses in the underlying pool of commercial mortgage loans.  In other words, the certificates at the top of the capital structure receive priority in payment of principal and interest, while the certificates at the bottom experience losses first when obligors default on the underlying loans.  To reflect the varying levels of risk, the certificates at the bottom of the capital structure receive the highest return on investment, while the certificates at the top receive the lowest return.

## II.     Morningstar's Methodology for Rating CMBS

33.     Credit rating agencies' consistency and transparency are important.  Without consistent application of rating methodology, ratings are not comparable from deal to deal. Similarly, without transparency, investors can neither assess the methodology employed by the rating agency nor the application of that methodology, and thus cannot determine what weight to accord the rating.  Morningstar's Code of Conduct reflected these priorities by requiring Morningstar employees to apply established criteria "in a consistent manner" and "publish sufficient information about its analytical criteria and methodologies so investors and issuers can understand how Morningstar derives its ratings."

A.    **Morningstar's Disclosed CMBS Methodology**

34.    From at least 2015 through at least 2016, Morningstar described the methodology that it used to determine CMBS ratings on its public website.  Morningstar did so in two documents posted on the website that it periodically updated, one entitled "CMBS New-Issue Ratings Opinions" and the other "CMBS Subordination Model."  The CMBS New-Issue Ratings Opinions document contained a general overview of Morningstar's CMBS rating process and the CMBS Subordination Model is a longer publication that detailed the Subordination Model's "primary features."  Collectively, the documents described Morningstar's methodology for determining credit ratings, including underwriting some of the pool of loans that collateralize the CMBS transactions, the modeling of those transactions, and the overall rating process.

1.    **Morningstar Used its Underwriting Process to Determine Each Property's Expected Net Cash Flow and Capitalization Rate**

35.    The first step of Morningstar's rating process was to underwrite a representative sample of the pool of commercial real estate loans that collateralized each CMBS transaction. As the CMBS New-Issue Ratings Opinions document put it, Morningstar employed a "bottom-up quantitative analysis" of the loans and corresponding properties comprising the CMBS transaction.  Through this underwriting process, Morningstar calculated the expected net cash flow[4] that each commercial property would generate over the life of the loan, along with the value of each property, using a capitalization rate that Morningstar also determined.[5]  As a result,

---

[4]  Morningstar determined net cash flow by forecasting the net operating income that each property was expected to generate over the life of the loan, and subtracting expected capital expenditures.

[5] Morningstar determined each property's value by dividing the net cash flow by the capitalization rate.  Capitalization rate is a measure used to value commercial properties and is used to estimate an investor's potential return on investment for the property.

the key outputs of the underwriting process were the net cash flow and capitalization rate for each loan.

      **2.**      **Morningstar Disclosed that Its CMBS Subordination Model Stressed Net Cash Flow and Capitalization Rates in "Defined" Ways**

36.      The next step of Morningstar's disclosed methodology, as explained in the publicly available CMBS Subordination Model document, was to input each loan's net cash flow and capitalization rate from the underwriting process into Morningstar's Subordination Model, an Excel spreadsheet.  The Subordination Model then subjected these values to "defined sets of stresses" to assess the likelihood of loans to default at each rating category.  The model's outputs showed the loans' losses under various economic scenarios, expressed as a percentage of the total value of the CMBS certificates being issued.  Those percentages were the model-generated subordination levels, or credit enhancement, for the various rating categories.  The Subordination Model was thus a critical step in determining the amount of credit enhancement needed for a class of CMBS certificates to attain a particular Morningstar rating.

37.      Morningstar publicly described how the Subordination Model stressed the net cash flow and capitalization rate for each loan.  For net cash flow, Morningstar stated that it imposed defined sets of stresses to account for potential declines in net cash flows, such as reduced rental payments for the properties securing the loans.  Morningstar stated that two factors determined the stress applied to net cash flows.  The first was the ratings category; Morningstar used more severe net cash flow stresses at the AAA ratings (representing the most stressful economic environment) and less severe stresses at the B rating category (representing a mildly stressful economic environment).  The second factor was the property type securing each loan.  Morningstar explained that it imposed different stresses for different property types (such as office, retail, multifamily, and industrial) because "certain property types experienced greater

[net cash flow] volatility than others."  But Morningstar also stated that the Subordination Model did not apply different stresses at the sub-property level, because of insufficient data.

38.     Like the net cash flow stresses, Morningstar also publicly described how it stressed the capitalization rates that it used to determine the value of the properties securing the mortgage loans that collateralized the CMBS transaction.  Morningstar stated in the CMBS Subordination Model document that it used different capitalization stresses at each ratings categories:  "the model stresses th[e] cap[italization] rate at each rating category to reflect Morningstar's belief that the balance between sellers and buyers in the commercial real estate market shifts along with the economic environments."  Morningstar described that "higher rating categories are stressed with a higher cap rate adjustment to reflect more restrictive property transaction environments," but the CMBS Subordination Model document made no mention of "loan-specific" adjustments to those stresses. [6]

---

[6]   In March 2016, Morningstar issued a new version of its CMBS New-Issue Ratings Opinions publication that updated its December 2014 version.  Like the December 2014 document, the March 2016 version contained a two-paragraph description of the Subordination Model that never mentions the "loan-specific" adjustments to net cash flow and capitalization rate stresses and refers to the 15-page CMBS Subordination Model publication that also never discloses the adjustments.  Later in the March 2016 CMBS New-Issue Ratings Opinions document, when describing the rating committee process, Morningstar stated that: "[o]n a case by case basis, the committee may require adjustments to Morningstar's collateral analysis or subordination model stresses before the model results are finalized and approved by the committee."  Adjustments "require[d]" by a ratings committee on a "case-by-case basis" are not the analyst-employed "loan-specific" adjustments to the net cash flow and capitalization stresses at issue in this matter.  The adjustments here were built into the Morningstar's Subordination Model itself and were routinely employed by Morningstar's analysts.  As Morningstar put it, a Morningstar "analyst could reduce the stresses" or "he or she could increase the stresses," or the "analyst could leave the baseline stresses unchanged" based on the analyst's "judgment and experience about the appropriate level of stress to apply."  *See also* CMBS New-Issue Ratings Opinions (March 2016) (ratings committee was "present[ed] [with] a summary of the CMBS deal, the model inputs and the model results[.]").

**B.      Morningstar's Undisclosed Additional Steps in Its Methodology:  "Loan-Specific" Adjustments to the Disclosed Stresses**

39.      Morningstar's publicly available CMBS Subordination Model document stated from at least 2015 through at least 2016 that it "detail[ed] [the model's] primary features," "cover[ed] each of the model's primary concepts and features" and provided the reader with a "clearer and more detailed understanding of the underpinnings of the model and the assumptions used in arriving at the credit support levels."  Nonetheless, Morningstar failed to disclose that a central feature of its Subordination Model allowed analysts to make "loan-specific" adjustments to the disclosed net cash flow and capitalization rate stresses.

40.      The adjustments were made in two columns of cells in the Excel spreadsheet that constituted Morningstar's CMBS Subordination Model.  One column was labelled, "LOAN SPECIFIC ADJUSTMENTS TO BASE N[ET] C[ASH] F[LOW] STRESS," and the other was labelled "LOAN SPECIFIC ADJUSTMENTS TO BASE CAP RATE STRESS."

41.      Morningstar has stated that its complete record of its established methodology for using the net cash flow and capitalization rate stresses adjustments consisted only of these column labels.  Other than the labels, Morningstar provided its analysts with no criteria or guidance for when or how to employ these adjustments.  Morningstar analysts also did not record, in the Subordination Model or otherwise, why the "loan-specific" adjustments were made.  Nor did the Subordination Model constrain how large the analyst-employed stress adjustments could be.

42.      Even the column labels in the Subordination Model's Excel spreadsheet failed to constrain the use of the adjustments.  Morningstar's corporate representative said that analysts could use the adjustments for reasons having nothing to do with a specific loan, such as to nudge a rating produced by the model to align with expectations.  Specifically, Morningstar's analysts

14

could use the "loan-specific" stress adjustments when "the aggregate levels that are spit out by the model are either too high or too low relative to other similar transactions we've looked at."

43.     In addition, while Morningstar's corporate representative said that the adjustments were justified because commercial real estate is "highly idiosyncratic" and requires "case-by-case" adjustments, an analysis of the models show that the same stress adjustment was sometimes repeated on all 100 or so loans in a particular ratings category.

44.     Despite Morningstar's failure to disclose the "loan-specific" stress adjustments on its website or in its regulatory filings, a 2017 internal review of the adjustments characterized them as a "central feature of the model."[7]

### C.    The Undisclosed "Loan-Specific" Stress Adjustments Materially Affected Morningstar's Rating Determinations

45.     Morningstar analysts used the Excel columns discussed above to make either or both of the "loan-specific" stress adjustments at various ratings categories in each of the 30 relevant CMBS transactions that it rated from 2015 through 2016.

46.      Upon information and belief, the issuers or arrangers paid Morningstar for its work on all 30 transactions.

47.     An analysis of the models shows that the vast majority of the Morningstar stress adjustments decreased the stresses in the transactions, particularly at the BBB ratings category and below.  This easing of the disclosed stresses had predictable effects.  Reducing the capitalization rate stresses served to increase property values and thus decrease required credit

---

[7]  Although the report of the review was marked as "attorney-client privileged," Morningstar produced the document to the SEC's Office of Credit Ratings on January 4, 2018 (after Morningstar last used the "loan-specific" adjustments in 2017).  When the SEC's Office of Credit Ratings inquired about whether the January 4, 2018 production contained privileged material, Morningstar confirmed in writing in March 2018 that it "does not assert attorney-client privilege on any materials produced to the [SEC] Staff on January 4, 2018."

enhancement, often resulting in higher Morningstar ratings than if the adjustments had not been used.  Similarly, reducing the net cash flow stresses served to increase forecasted net cash flows and thus decrease required credit enhancement, again often resulting in higher Morningstar ratings than if the adjustments had not been used.

48.     Ultimately, Morningstar's easing of the disclosed net cash flow and capitalization stresses resulted in materially higher Morningstar ratings for hundreds of millions of dollars' worth of CMBS certificates.  In the aggregate, an analysis of the models shows that the adjustments resulted in higher Morningstar ratings for at least 100 CMBS classes.  Morningstar seldom increased the "loan-specific" adjustments sufficiently to lower ratings.

49.     The practical effect was investors were not able to adequately assess the ratings determined by Morningstar and their associated risks.  Moreover, given that subordination levels are a primary consideration when credit rating agencies are hired to rate deals, these "loan-specific" adjustments made it more likely that issuers would hire or continue to hire Morningstar for its ratings.  The adjustments also benefited the issuers that paid for the ratings because in certain instances it enabled those issuers to pay investors less interest than they otherwise would have paid without the adjustments.

50.     For example, in October 2015, Morningstar rated a $1.1 billion CMBS transaction.  Morningstar used the undisclosed "loan-specific" stress adjustments to reduce its required credit enhancement at every rating category, including AAA.  This resulted in Morningstar rating tens of millions of dollars in certificates with materially higher ratings than the certificates would have received from Morningstar had it rated in accordance with its public description of its methodology.  More specifically, if Morningstar had not employed the undisclosed "loan-specific" stress adjustments and assuming no change to the transaction

structure, an analysis of the models shows that Morningstar would have rated: (1) $47 million of

CMBS certificates AA+, instead of AAA; (2) $72 million of CMBS certificates A-, instead of

AA-; (3) $54 million of CMBS certificates BBB, instead of A-; and (4) $61 million of CMBS

certificates CCC+, rather than BBB-. With respect to this last figure, BBB- is the lowest

investment-grade rating; CCC+ is not only non-investment-grade, but Morningstar warned that

"[a] rating of CCC indicates a material likelihood of default." Therefore, Morningstar used the

undisclosed adjustments to rate tens of millions of dollars in CMBS certificates as investment-

grade, when it likely would have rated those same securities as having a "material likelihood of

default" without the adjustments.

     51.     Similarly, in mid-2015, Morningstar rated a $720 million CMBS transaction and

again used the undisclosed "loan-specific" stress adjustments to reduce its required credit

enhancement at most ratings categories. This resulted in Morningstar rating tens of millions of

dollars in certificates with materially higher ratings than the certificates would have received

from Morningstar had it rated in accordance with its public description of its methodology.

Without the undisclosed "loan-specific" stress adjustments and assuming the same transaction

structure, an analysis of the models shows that Morningstar would have rated: (1) $33 million of

CMBS certificates BBB+, instead of A-; (2) $24 million of CMBS certificates BB- (non-

investment-grade), instead of BBB (investment-grade) (3) $10 million of CMBS B (non-

investment-grade) instead of BBB- (investment-grade); and (4) $14 million of CMBS certificates

as CCC+, instead of BB-.

     **D.**     **Morningstar Further Failed to Disclose the "Loan-Level" Stress Adjustments in Its Annual Form NRSRO Certification Documents**

     52.     On March 30, 2015 and March 30, 2016, Morningstar filed with the SEC its

annual certification documents, including its Form NRSRO and Exhibit 2, which purported to

describe the procedures and methodologies that Morningstar used to determine credit ratings. Morningstar also posted these documents to its public website.

53.     The instructions to the Form NRSRO require that NRSROs include on Exhibit 2 a "general description of the procedures and methodologies used by the Applicant/NRSRO" that is "sufficiently detailed to provide users of credit ratings with an understanding of the processes the applicant or NRSRO employs to determine credit ratings, including . . . the quantitative and qualitative models used to determine credit ratings[.]"

54.     Under the heading "Quantitative and Qualitative Models" on Exhibit 2, instead of providing a text description within the Exhibit 2 filing, Morningstar stated that descriptions of the model that it used to determine credit ratings "appear[s] in [Morningstar's] methodologies, criteria, and model white papers on [Morningstar's] public website."  The documents comprising this information contained the above-described CMBS New-Issue Ratings Opinions and CMBS Subordination Model documents posted on Morningstar's website.[8]

55.     As described above, neither of those documents described the "loan-specific" adjustments to the net cash flow and capitalization rate stresses that Morningstar incorporated into its Subordination Model.  The omission of any reference to the "loan-specific" stress adjustments thus prevented users of credit ratings from understanding Morningstar's process for determining CMBS ratings.

---

[8]  Morningstar periodically updated its CMBS New-Issue Ratings Opinion and CMBS Subordination Model documents.  The relevant versions are: (1) the December 2014 CMBS New-Issue Ratings Opinion and December 2014 CMBS Subordination Model documents, which, upon information and belief, appeared on Morningstar's website when it filed its 2015 Form NRSRO and corresponding Exhibit 2 on March 30, 2015; and (2) the December 2015 CMBS Subordination Model and March 2016 CMBS New-Issue Ratings Opinion documents, which, upon information and belief, appeared on Morningstar's website when it filed its 2016 Form NRSRO and corresponding Exhibit 2 on March 30, 2016.

### E.     Morningstar Failed to Identify the Version of the Methodology That It Used to Determine CMBS Credit Ratings

56.     Under Rule 17g-7 of the Exchange Act, which went into effect in June 2015, Morningstar was required to disclose to users of credit ratings the version of the procedure or methodology used to determine each credit rating.  To do so, Morningstar issued "Rule 17g-7 Disclosures and Certifications" for the bulk of the 30 transactions.[9]

57.     In many of the Rule 17g-7 disclosures, Morningstar referred users of credit ratings to the same CMBS New-Issue Ratings Opinion and CMBS Subordination Model documents that failed to describe the "loan-specific" stress adjustments to net cash flow and capitalization rates.  For example, Morningstar rated a $720 million CMBS transaction in June 2015 and issued a Rule 17g-7 disclosure the following month, in July 2015.  In that disclosure, Morningstar stated that the version of the methodology that it used to determine the credit rating was contained in the December 2014 CMBS New-Issue Ratings Opinion and December 2014 CMBS Subordination Model documents posted its to its website, along with another public document discussing re-securitization CMBS ratings that is not relevant here.

58.     But Morningstar did not use the methodology described in the CMBS New-Issue Ratings Opinion and CMBS Subordination Model documents to rate the CMBS transactions, because those documents failed to disclose that Morningstar's analysts made "loan-specific" adjustments to the cash flow and capitalization stresses that were discussed in the CMBS Subordination Model document.

---

[9]  Rule 17g-7 went into effect on June 18, 2015, 72 Fed. Reg. 33564, and Morningstar did not issue Rule 17g-7 disclosures contemporaneously with the closing dates of the six CMBS relevant transactions it rated before that time.

59.     Accordingly, Morningstar's Rule 17g-7 disclosures failed to identify accurately the version of the methodology that Morningstar used to determine credit ratings, as required by Rule 17g-7(a)(1)(ii)(B) for at least the following CMBS transactions:  GCMT 2015-GC31 (dated July 8, 2015); COMM 2015-PC1 (dated July 14, 2015); COMM 2015-CCRE24 (dated August 6, 2015); WFCM 2015-SG1 (dated August 27, 2015); BACM 2015-UBS7 (dated September 24, 2015); CGCMT 2015-GC33 (dated September 29, 2015); WFCM 2015-LC22 (dated September 29, 2015); COMM 2015-CCRE26 (dated October 8, 2015); WFCM 2015-C31 (dated November 12, 2015); MSBAM 2015-C27 (dated November 24, 2015); CSAIL 2015-C4 (dated November 25, 2015); CSAIL 2016-C5 (dated February 9, 2016); LSTAR 2016-4 (dated June 29, 2016); CSAIL 2016-C6 (dated May 26, 2016); WFCM 2016-NXS6 (dated October 13, 2016); WFCM 2016-C36 (dated November 3, 2016); CFCRE 2016-C6 (dated November 22, 2016); and WFCM 2016-LC25 (dated December 8, 2016).

**F.     Morningstar Lacked Effective Internal Controls Regarding Its Analysts' Use of the Undisclosed "Loan-Specific" Adjustments**

60.     Separately from Morningstar's failure to disclose the loan-specific stress adjustments, Morningstar also failed to establish, maintain, enforce, and document effective internal controls regarding implementation of the "loan-specific" stress adjustments used to rate 30 CMBS transactions from 2015 through 2016, along with an additional transaction that Morningstar rated in March 2017.

61.     This lack of internal controls resulted from material weaknesses in Morningstar's internal control structure for these 31 transactions.  Specifically, Morningstar's internal control structure relating to the determination of CMBS ratings omitted elements designed to assess whether its analysts appropriately implemented "loan-specific" stress adjustments.  Morningstar

thus lacked effective internal controls to ensure that its analyst employed the "loan-specific" adjustments for loan-specific reasons, instead of another reason.

62.     For instance, Morningstar's Rule 17g-2(a)(6)-required "complete" record of its established methodology for using the net cash flow and capitalization rate stress adjustments consisted only of the following Excel column labels from the Subordination Model: "LOAN SPECIFIC ADJUSTMENTS TO BASE N[ET] C[ASH] F[LOW] STRESS," and "LOAN SPECIFIC ADJUSTMENTS TO BASE CAP RATE STRESS."  Beyond these few words, there were no criteria for how, why, or when to make these "loan-specific" stress adjustments, nor did Morningstar require analysts to even document why those adjustments were made.  And Morningstar has acknowledged that "[our CMBS] methodology d[oes] not include a framework or guidance" for determining the net cash flow and capitalization rate stress adjustments employed by its analysts. Morningstar's corporate representative also said there was nothing "written down" containing guidelines or instructions for when the analysts could make the stress adjustments.

63.     As described above, Morningstar's lack of effective internal controls resulted in Morningstar allowing its analysts to employ supposed "loan-specific" adjustments for reasons unrelated to the specific loans or individual properties securing those loans.  As Morningstar's corporate representatives testified, analysts could make adjustments for non-loan-specific reasons, such as to ratchet a rating up in line with expectations.  Furthermore, analysts sometimes used the supposed "loan-specific" adjustments on a portfolio-wide basis in each ratings category, meaning that the same so-called "loan-specific" stress adjustment was applied to every loan in the ratings category.

64.     Morningstar's records show that, on February 16, 2017, a Morningstar employee raised a concern regarding the "integrity and appropriateness of adjustments made to the [Subordination] [M]odel."

65.     During the same month, Morningstar issued its "CMBS General Ratings Methodology" publication that first referenced the potential for "adjustments to the base stresses in the Subordination Model applied to the sustainable NCF and value for the properties," but it failed to disclose that its Subordination Model made the adjustments on a "loan-specific" basis. Nor did Morningstar's February 2017 CMBS Subordination Model publication reference the "loan-specific" stress adjustments, even though the document discusses the net cash flow and capitalization rate stresses in detail.

66.     Morningstar only rated one CMBS transaction using the "loan-specific" stress adjustment after February 2017 (in March 2017), then it stopped using the methodology that included the adjustments.  In rating the March 2017 CMBS transaction, Morningstar suffered from the same lack of effective internal controls described above.

67.     Morningstar sent to the SEC an unaudited report on Morningstar's internal control structure after the end of each year from 2015 through 2016.  Each report stated that Morningstar's management had assessed Morningstar's internal control structure as of the end of the year and concluded that it was "effective," even though, as described above, Morningstar lacked effective internal controls governing the "loan-specific" adjustments that constituted a central feature of its Subordination Model.

## TOLLING AGREEMENTS

68.     Morningstar and the SEC entered into tolling agreements suspending the running of any applicable statute of limitations from March 2, 2020 through September 2, 2020; from September 2, 2020 to September 22, 2020; and from September 22 through January 31, 2021.

## FIRST CLAIM FOR RELIEF
### Violations of Section 15E(b)(2)(A) and Rule 17g-1(f) of the Exchange Act

69.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 68.

70.     By engaging in the conduct above, Morningstar failed to describe the methodologies that it used to determine credit ratings on Exhibit 2 to its 2015 and 2016 Form NRSRO annual certifications, in violation of Section 15E(b)(2)(A) and Rule 17g-1(f) of the Exchange Act.

71.     Morningstar violated Section 15E(b)(2)(A) and Rule 17g-1(f) of the Exchange Act by, among other things, failing to file annual certifications in 2015 and 2016 that included a "general description of the procedures and methodologies used" to determine credit ratings that was "sufficiently detailed to provide users of credit ratings with an understanding of the processes" Morningstar used to determine credit ratings.  Instead, and as described above, Morningstar submitted 2015 and 2016 certifications that incorporated Morningstar's CMBS New-Issue Ratings Opinion and CMBS Subordination Model publications, which omitted the "loan-specific" stress adjustments from Morningstar's disclosed methodology for determining credit ratings.

72.     Unless enjoined, Morningstar will again violate Section 15E(b)(2)(A) and Rule 17g-1(f) of the Exchange Act [15 U.S.C. §§ 78o-7(b)(2)(A) and 17 C.F.R. §§ 240.17g-1(f)].

**SECOND CLAIM FOR RELIEF**
**Violations of Rule 17g-7(a)(1)(ii)(B)of the Exchange Act**

73.     The SEC realleges and incorporates by reference here the allegations in

paragraphs 1 through 72.

74.     By engaging in the conduct above, Morningstar failed to disclose the version of

the methodologies used to determine its credit ratings from 2015 through 2016, in violation of

Rule 17g-7(a)(1)(ii)(B) of the Exchange Act [17 C.F.R. §§ 240.17g-7(a)(1)(ii)(B)].  Instead, and

as described above, Morningstar issued Rule 17g-7 reports for the CMBS transactions that

incorporated Morningstar's CMBS New-Issue Ratings Opinion and CMBS Subordination Model

publications, which omitted the "loan-specific" stress adjustments from Morningstar's disclosed

methodologies for determining credit ratings.

75.     Unless enjoined, Morningstar will again violate Rule 17g-7(a)(1)(ii)(B) of the

Exchange Act [17 C.F.R. § 240.17g-7(a)(1)(ii)(B)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 15E(c)(3)(A) of the Exchange Act**

76.      The SEC realleges and incorporates by reference here the allegations in

paragraphs 1 through 75.

77.     By engaging in the conduct above, Morningstar failed to establish, maintain,

enforce, and document an effective internal control structure governing the implementation of

and adherence to its methodologies for determining CMBS credit ratings, in violation of Section

15E(c)(3)(A) of the Exchange Act [15 U.S.C. § 78o-7(c)(3)(A)].

78.     Unless enjoined, Morningstar will again violate Section 15E(c)(3)(A) of the

Exchange Act [15 U.S.C. § 78o-7(c)(3)(A)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant, and each of their respective agents, servants, employees, attorneys, affiliates, successors, and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 15E(b)(2)(A) and 15E(c)(3)(A) of the Exchange Act [15 U.S.C. §§ 78o-7(b)(2)(A) and 78o-7(c)(3)(A)], and Rules 17g-1(f) and 17g-7(a)(1)(ii)(B) of the Exchange Act [17 C.F.R. §§ 240.17g-1(f); and 240.17-7(a)(1)(ii)(B)];

### II.

Ordering Defendant to disgorge all ill-gotten gains obtained within the statute of limitations, with prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

### III.

Ordering Defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### IV.

Granting any other and further relief this Court may deem just and proper for the benefit of investors.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands trial by jury.

Dated:  February 16, 2021                    Respectfully submitted,


                                             _____/s/ James P. Connor_____
                                             James P. Connor*
                                             Derek S. Bentsen (DB8369)
                                             Attorneys for Plaintiff
                                             U.S. SECURITIES AND EXCHANGE
                                             COMMISSION
                                             100 F Street NE
                                             Washington, DC 20549
                                             Tel: (202) 551-8394
                                             Email: connorja@sec.gov

*Pending admission pro hac vice

Of counsel:
Thomas A. Bednar
Robert E. Leidenheimer, Jr.
Brent S. Mitchell
100 F Street NE
Washington, DC 20549