UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

MORNINGSTAR CREDIT RATINGS, LLC

Defendant.

Case No.  1:21-cv-01359-RA
ORAL ARGUMENT REQUESTED

Defendant Morningstar Credit Ratings, LLC's
**Memorandum of Law in Support of its Motion to Dismiss**

Stephen L. Cohen
David S. Petron
Christopher R. Mills
Benjamin M. Mundel
Cody L. Reaves
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005
Tel.:  (202) 736-8000
Fax:  (202) 736-8711
bmundel@sidley.com

*Counsel for Defendant Morningstar
Credit Ratings, LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................ 3

      A.    Statutory and Regulatory Framework ........................................... 3

      B.    Factual Background ...................................................................... 7

LEGAL STANDARD ........................................................................................ 10

ARGUMENT ..................................................................................................... 11

    I.     MCR Complied With The Form NRSRO Instructions Requiring A "General Description" Of Its Methodologies .......................................................... 11

      A.    The SEC does not plausibly plead that MCR failed to provide a general description of its credit rating methodologies............................... 12

      B.    MCR's "general description" of its methodologies and model was sufficient as a matter of law. .................................................... 16

      C.    The SEC's expansive reading of Exhibit 2's instructions violates due process............................................................................................ 17

    II.    The SEC Does Not Plausibly Plead That MCR Failed To Identify The Version Of The Methodology It Used In Particular Ratings.............................. 20

    III.    The SEC Does Not Plausibly Plead That MCR Failed To Have An Effective Internal Control Structure. ...................................................................... 21

    IV.    The Court Should Dismiss The Claim For Injunctive Relief. ............................ 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*Abdullah v. Am. Airlines, Inc.*,
  181 F.3d 363 (3d Cir. 1999) .................................................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................10, 25

*Comm'r v. Soliman*,
  506 U.S. 168 (1993), *superseded by statute on other grounds* .................................12

*CFTC v. First Nat'l Bullion Corp.*,
  461 F. Supp. 659 (S.D.N.Y. 1978), *aff'd*, 598 F.2d 609 (2d Cir. 1979) ...........................13, 17

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ..................................................................................19, 24

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ..................................................................................17, 18

*Gates & Fox Co. v. OSHRC*,
  790 F.2d 154 (D.C. Cir. 1986) .........................................................................19

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) .....................................................................18, 19

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) ..........................................................................11

*Rouviere v. DePuy Orthopaedics, Inc.*,
  No. 1:18-cv-04814 (LJL) (SDA), 2020 WL 1080775 (S.D.N.Y. Mar. 7, 2020) ...................13

*Russello v. United States*,
  464 U.S. 16 (1983) .....................................................................................15

*SEC v. American Bd. of Trade, Inc.*,
  751 F.2d 529 (2d Cir. 1984) ..........................................................................24

*SEC v. Bausch & Lomb Inc.*,
  565 F.2d 8 (2d Cir. 1977) .............................................................................25

*SEC v. Cavanagh*,
  155 F.3d 129 (2d Cir. 1998) .......................................................................24, 25

*SEC v. Commonwealth Chem. Sec., Inc.*,
  574 F.2d 90 (2d Cir. 1978) ...........................................................................25

*SEC v. Fowler*,
  440 F. Supp. 3d 284 (S.D.N.Y. 2020), *appeal docketed*, No. 20-1081 (2d Cir.
  Mar. 26, 2020)..................................................................................................25

*SEC v. Gentile*,
  939 F.3d 549 (3d Cir. 2019)...........................................................................25

*SEC v. Mgmt. Dynamics, Inc.*,
  515 F.2d 801 (2d Cir. 1975)...........................................................................24

*Spinello v. N.Y., N.H. & H.R. Co.*,
  183 F. 762 (2d Cir. 1910)...............................................................................13

*Turner v. Gen. Motors Acceptance Corp.*,
  180 F.3d 451 (2d Cir. 1999)...........................................................................12

*United States v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013)...........24

*United States v. Matthews*,
  787 F.3d 38 (2d Cir. 1986).......................................................................15, 18

*Upton v. SEC*,
  75 F.3d 92 (2d Cir. 1996).........................................................................18, 19

*Wojchowski v. Daines*,
  498 F.3d 99 (2d Cir. 2007).............................................................................11

**Statutes and Regulations**

Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327 ......................3

17 C.F.R. § 11.4(b)(1).............................................................................................12

17 C.F.R. § 229.402(e)(1)........................................................................................14

17 C.F.R. § 229.1111(a)(2).......................................................................................14

17 C.F.R. § 229.1114(a)...........................................................................................14

17 C.F.R. § 240.14a................................................................................................14

Exchange Act Section 15E [15 U.S.C. § 78o–7] .............................................................3

Exchange Act Section 15E(a) [15 U.S.C. § 78o–7(a)] .................................................5, 25

Exchange Act Section 15E(b)(2)(A) [15 U.S.C. § 78o–7(b)(2)(A)] .....................................11

Exchange Act Section 15E(c) [15 U.S.C. § 78o–7(c)] .......................................... *passim*

Exchange Act Section 15E(p) [15 U.S.C. § 78o–7(p)]................................................7, 9, 10, 19

*Information Required of Large Traders Pursuant to Section 13(h) of the*
   *Securities Exchange Act of 1934*, Form 13H, Instructions, Item 1 .........................................17

Rule 17g–1 [17 C.F.R. § 240.17g–1]................................................................................5, 11

Rule 17g–2(a)(6) [17 C.F.R. § 240.17g–2(a)(6)]................................................................ *passim*

Rule 17g–3 [17 C.F.R. § 240.17g–3] ...........................................................................22

Rule 17g–7 [17 C.F.R. § 240.17g–7]...........................................................................6, 20

Rule 17g–8(d) [17 C.F.R. § 240.17g–8(d)] ....................................................................6, 22

*Nationally Recognized Statistical Rating Organizations*, 79 Fed. Reg. 55,078
   (Sept. 15, 2014)................................................................................................ *passim*

*Oversight of Credit Rating Agencies Registered as Nationally Recognized*
   *Statistical Rating Organizations*, 72 Fed. Reg. 33,564 (June 18, 2007) ....................... *passim*

**Rule**

S. & E.D.N.Y.R. 33.3(a) .......................................................................................13

**Legislative Material**

S. Rep. No. 111-176 (2010)......................................................................................4

## INTRODUCTION

Morningstar Credit Ratings, LLC ("MCR"), a former credit rating agency, used to have a credit rating methodology that included a quantitative model that ran numerous calculations using many inputs. One part of this model applied stresses to some of those calculations. The stress levels were set by considering two loan-specific adjustments (the "adjustments") to base-level stresses. As part of the model, these adjustments incorporated analytical judgment and experience into MCR's methodological approach.

The SEC, however, does not like that MCR's former methodology included these adjustments. But to ensure the analytical independence of credit rating agencies, Congress barred the SEC from "regulat[ing] . . . the procedures and methodologies by which any [agency] determines credit ratings." Section 15E(c)(2) [15 U.S.C. § 78o–7(c)(2)]. Frustrated by this congressional prohibition, the SEC has tried various attacks on MCR's inclusion of the adjustments in its long-retired methodology. During its five-year investigation, the SEC spun out a series of flawed legal theories in an effort to sanction MCR for the adjustments. MCR shot down those theories during the Wells process, and the SEC has now abandoned them. Unwilling to accept the reality that MCR complied with the law, the SEC's complaint contrives a new theory—for which it gave no Wells notice to MCR—that dresses up the SEC's objections to the adjustments as "disclosure" issues. But this is just a manufactured litigating position with no basis in the actual regulations. As a result, the Court now has before it a meritless case of first impression, with no allegation of any actual harm, against a wound-down credit rating agency.

The SEC's first claim (Count I) is that MCR failed to comply with instructions to an SEC form (Exhibit 2 of Form NRSRO) by failing to disclose the adjustments at issue. But the SEC's instructions for that exhibit require only a "general description" of credit rating methodologies. The instructions do not require a credit rating agency to make detailed and specific disclosures

about the inputs, assumptions, or adjustments in each of its credit rating methodologies or models. To the contrary, the instructions list ten different items that a credit rating agency must provide "descriptions" of to ensure that its "general description" is "sufficiently detailed to provide users of credit ratings with an understanding of the processes employed" by the credit rating agency. Nowhere in this list does the SEC ask for details about adjustments, variable inputs, or any other component of an individual methodology.

Because the instructions require only a "general description"—and MCR provided just that—the SEC tries to invent a novel regulatory requirement for this case. The SEC argues that MCR should have disclosed the possibility of making the adjustments because this was "material" to the former methodology. But there is no such requirement. If the SEC wants disclosure of each "material" aspect of every model, it needs to amend its instructions through rulemaking. It cannot use an enforcement proceeding to change the rules retroactively.

The theory behind Count II is even more flawed. The regulation in Count II required MCR merely to identify "[t]he version of the procedure or methodology" it used for a particular credit rating. The SEC admits that MCR identified the correct versions of its methodology and model but asserts that this was insufficient because MCR did not also disclose the adjustments in its public description of the model. That has nothing to do with the actual legal requirement. The rule does not require any description at all—only that the methodology be identified. And there is no question that MCR identified the right methodology.

Count III requires the SEC to allege that MCR failed to maintain an effective overall internal control structure. But the SEC pleads only that MCR lacked a specific control to assess the application of the adjustments in the model. This does not state a claim because neither the statute nor any regulation requires an individual control over any particular input to a credit

rating model. With no allegation regarding a failure in MCR's overall control structure, Count III fails to state a claim.

Finally, the SEC seeks an injunction to prevent MCR from violating these rules in the future, but it does not allege that there is any likelihood—let alone the required "substantial likelihood"—of a future violation. Far from it: this is the unusual case where it is legally impossible for MCR to commit a future violation. MCR is no longer registered with the SEC, has no outstanding credit ratings, and no longer operates as a credit rating agency. It is no longer subject to the relevant rules, so it cannot possibly violate them in the future. The SEC acknowledged all this in its complaint, and it made no factual allegations that MCR will ever assign a credit rating again. Thus, the demand for an injunction should be dismissed.

The SEC devotes a whole section of its complaint to second guessing MCR's ratings and impugning MCR's integrity—but only by insinuation, because it has not pled that MCR departed from its methodology when applying the adjustments. The SEC cannot jettison MCR's analytical judgments about the adjustments in favor of its own credit views. Congress protected the analytical independence of credit rating agencies by barring the SEC from regulating their methodologies or ratings. This Court should reject the SEC's attempt to contort existing regulations well beyond their breaking point to circumvent this congressional constraint.

## BACKGROUND

### A.     Statutory and Regulatory Framework

In 2006, Congress passed the Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327, which added Section 15E to the Securities Exchange Act of 1934 ("Exchange Act"). Section 15E gave the SEC a limited role in overseeing credit rating agencies. Credit rating agencies could register with the SEC as Nationally Recognized Statistical Rating Organizations (or "NRSROs"). [15 U.S.C. § 78o–7]. The SEC was authorized to impose

registration, disclosure, conflict-of-interest, and record-keeping requirements on these NRSROs. But Congress explicitly constrained the SEC's authority, prohibiting it from "regulat[ing] the substance of credit ratings or the procedures and methodologies by which any [NRSRO] determines credit ratings." Section 15E(c)(2) [15 U.S.C. § 78o–7(c)(2)]; *see also* S. Rep. No. 111-176, at 116 (2010) ("[O]versight must avoid interfering in the analytical process and methodologies, and refrain from second-guessing rating opinions."). Congress also mandated that any SEC regulation "shall be narrowly tailored to meet the requirements of this chapter." Section 15E(c)(2) [15 U.S.C. § 78o–7(c)(2)].

The SEC initially planned to require NRSROs to "disclose each actual procedure and methodology." *Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations*, 72 Fed. Reg. 33,564, 33,575 (June 18, 2007). After receiving comments, however, the SEC changed course and agreed that it would merely "require that an applicant . . . *describe* its procedures and methodologies rather than submit and disclose each *actual* procedure and methodology." *Id.* (emphasis added). The SEC reached this result because "procedures and methodologies may involve the use of proprietary models," and "disclosing all the procedures could be burdensome and could result in an overload of information that would be less helpful to users of credit ratings." *Id.* Therefore the Commission "modified the instructions to require that the Exhibit [2] contain a *description* of the procedures and methodologies (not the submission and disclosure of each actual procedure and methodology)," *id.* (emphasis added), and that methodologies (including any associated model) instead "be documented internally," *id.* at 33,585.

As relevant here, the SEC's regulations impose five obligations on NRSROs:

*1. Complete Records of Each Methodology*. First, the credit rating agency "must make and retain . . . complete and current" records of its "established procedures and methodologies used . . . to determine credit ratings." Rule 17g–2(a)(6) [17 C.F.R. § 240.17g–2(a)(6)]. Credit rating agencies frequently use different methodologies to rate different asset classes, and this recordkeeping requirement mandates that they retain a complete record of each methodology, including any associated models, for SEC inspection. *Id.* The rule requires no public disclosure.

*2. General Description of Methodologies*. Second, the credit rating agency must publicly disclose a "general description of the procedures and methodologies" it uses to rate securities. *Nationally Recognized Statistical Rating Organizations*, 79 Fed. Reg. 55,078, 55,302 (Sept. 15, 2014) (instructions to Form NRSRO Exhibit 2).[1] The Exhibit 2 instructions further elaborate that the "general description" must be "sufficiently detailed to provide users of credit ratings with an understanding of the processes employed by the Applicant . . . including, as applicable . . . descriptions" of ten different items. *Id.* These items all seek high-level descriptions about how the credit rating agency operates, including a "description" of "quantitative and qualitative models" used. *Id.* The SEC has made clear that the purpose of this general description is not to require the credit rating agency to detail each of its various models but rather to provide users of credit ratings "with an understanding of the nature of the credit rating agency (*i.e.*, a user of quantitative models, qualitative analysis, or a combination of both) and how the credit rating agency produces credit ratings." 72 Fed. Reg. at 33,575. The instructions do not require the

---

[1] This disclosure is mandated on the application a company must file with the SEC to become an NRSRO, known as a "Form NRSRO." Section 15E(a)(1) [15 U.S.C. § 78o–7(a)(1)]; Rule 17g–1(a) [17 C.F.R. § 240.17g–1(a)]. Once registered, the credit rating agency must update its Form NRSRO annually. Rule 17g–1(f) [17 C.F.R. § 240.17g–1(f)]. This Form requires the credit rating agency to provide basic information about itself. 79 Fed. Reg. at 55,276–81; Rule 17g–1 [17 C.F.R. § 240.17g–1]. One of the many exhibits required by the Form NRSRO is Exhibit 2, which is at issue in this case. 79 Fed. Reg. at 55,280. The instructions to Exhibit 2 were originally adopted in 2007. *See* 72 Fed. Reg. at 33,574–76. An amended version was adopted in 2014 and remained in effect during the period relevant to this case. *See* 79 Fed. Reg. at 55,302. Differences between the two versions are immaterial here.

disclosure of any individual aspect of a specific model, including particular inputs or qualitative adjustments. 79 Fed. Reg. at 55,302–03. The instructions also permit a credit rating agency to direct readers to the credit rating agency's website for information. *Id.* at 55,303.

     **3. *Credit Rating Disclosure***. Third, when an agency assigns a credit rating, it must specifically disclose 14 categories of information on a separate form. *See* Rule 17g–7 [17 C.F.R. § 240.17g–7]. One thing that must be disclosed is "[t]he version of the procedure or methodology used" in assigning the credit rating. Rule 17g–7(a)(1)(ii)(B) [17 C.F.R. § 240.17g–7(a)(1)(ii)(B)]. The SEC explained that a credit rating agency satisfies this rule by "identifying the name of the procedure or methodology, the date the procedure was implemented, and a hyperlink to further information about the procedure or methodology." 79 Fed. Reg. at 55,169.

     **4. *Internal Control Structure***. Fourth, the credit rating agency must maintain an "effective internal control structure" governing the implementation of and adherence to its policies, procedures, and methodologies for determining credit ratings. Section 15E(c)(3)(A) [15 U.S.C. § 78o–7(c)(3)(A)]. While the SEC has identified factors that an NRSRO must consider in establishing, maintaining, enforcing, and documenting its internal control structure, *see* Rule 17g–8(d) [17 C.F.R. § 240.17g–8(d)], it has "not mandat[ed] that a specific factor be implemented," and NRSROs retain the flexibility to "tailor their internal control structures to their particular circumstances." 79 Fed. Reg. at 55,099. Thus, no rule mandates particular internal controls or controls over application of each specific component of a credit rating methodology. Rather, NRSROs must have an overall "internal control *structure*" that in its entirety is effective. The Commission acknowledged that "[e]ven a well-designed internal control structure cannot guarantee that a deficiency will never occur." *Id.* at 55,103.

*5. Annual Examination*. Fifth, all NRSROs are examined each year by the SEC's Office of Credit Ratings. Section 15E(p)(3)(A) [15 U.S.C. § 78o–7(p)(3)(A)]. During these exams, the SEC can inspect the full methodologies used for assigning and monitoring credit ratings, the disclosures, and the NRSRO's internal control structure. 15E(p)(3)(B) [15 U.S.C. § 78o–7(p)(3)(B)]. "Deficiencies in the internal control structure found by the examination staff are brought to the attention of the NRSRO, and the staff monitors whether and how those deficiencies are addressed." 79 Fed. Reg. at 55,098.

These regulatory requirements respect both the statutory mandate that they be narrowly tailored and the statutory prohibition on regulating the substance of credit rating methodologies or procedures. For example, the combination of Rule 17g–2's requirement to *privately* record each complete methodology and Exhibit 2's requirement to *publicly* disclose a general description of methodologies and models is narrowly tailored to serve the SEC's oversight needs and the goal of allowing users of credit ratings to understand the nature of the credit rating agency without an unhelpful overload of information. *See* 72 Fed. Reg. at 33,575, 33,585. Similarly, the SEC has not mandated specific internal controls that an NRSRO must implement, because doing so would be a substantive regulation of the NRSRO's procedures or methodologies, in violation of Section 15E(c)(2) [15 U.S.C. § 78o–7(c)(2)].

### B.    Factual Background

From 2008 to 2019, MCR was registered with the SEC as an NRSRO. Compl. ¶ 20. MCR rated several different asset classes during this time period, including, as relevant here, commercial mortgage-backed securities (CMBS). Compl. ¶ 28. During the time MCR was in operation, it complied with the SEC regulations described above.

*1. Complete Records of its Methodology:* MCR maintained a complete record of its CMBS methodology as required by Rule 17g–2. *See* 17 C.F.R. § 240.17g–2(a)(6). The SEC

*never* alleges otherwise. That record included (a) a "CMBS New-Issue Ratings Opinions" paper which provided a description of the methodology; (b) a "CMBS Subordination Model" white paper which provided a description of the model; and (c) the complete model (a spreadsheet) that was a "critical component" of its CMBS methodology. *See* Ex. D (CMBS New-Issue Ratings Opinions, Mar. 2016); Ex. F (CMBS Subordination Model white paper, Dec. 2015).

   *2. General Description of its Methodologies:* MCR also publicly disclosed a general description of its methodologies, including its CMBS methodology that incorporated a model. Compl. ¶¶ 70–71. MCR's forms at issue in this case (Form NRSROs for 2015 and 2016) each included an Exhibit 2 where, in the "Quantitative and Qualitative Models" section, MCR stated that "[d]escriptions of MCR's quantitative and qualitative models appear in its methodologies, criteria, and model white papers . . . on its public website." Ex. A (Ex. 2 to Form NRSRO, filed Mar. 30, 2015); Ex. B (Ex. 2 to Form NRSRO, filed Mar. 30, 2016). On its website, MCR published its methodologies and models. As relevant here, MCR published its overall CMBS Methodology (in the "CMBS New-Issue Ratings Opinions" paper) and a description of its CMBS Subordination Model (in the "CMBS Subordination Model" white paper). *See* Ex. C (CMBS New-Issue Ratings Opinions, Dec. 2014); Ex. D. (CMBS New-Issue Ratings Opinions, Mar. 2016); Ex. E (CMBS Subordination Model white paper, Dec. 2014); Ex. F (CMBS Subordination Model white paper, Dec. 2015). The white paper provided a *15-page* description of "the basic concepts underlying the model and detail[ed] its primary features." Ex. E (CMBS Subordination Model white paper, Dec. 2014) at 3; Ex. F (CMBS Subordination Model white paper, Dec. 2015) at 3. Both methodology documents explained that MCR's CMBS model was an "integral" component of its methodology. *See* Ex. C (CMBS New-Issue Ratings Opinions, Dec. 2014) at 3; Ex. D (CMBS New-Issue Ratings Opinions, Mar. 2016) at 3. In accordance with

SEC rules, MCR did not publish the actual model or a list of all in-model inputs, formulas, or potential adjustments. *See* 72 Fed. Reg. at 33,575 (noting that complete methodologies must be documented only internally).

**3. Credit Rating Disclosure:** For each CMBS credit rating identified in the complaint, MCR made a Rule 17g–7 Disclosures and Certification. *See, e.g.*, Ex. G-2 (Rule 17g–7 Disclosures & Certification, CGCMT 2015-GC31, July 8, 2015).[2] These disclosed the 14 items required by Rule 17g–7. MCR included a section: "Version of the procedure or methodology used to determine the credit rating." Ex. G-2 (Rule 17g–7 Disclosures & Certification, CGCMT 2015-GC31, July 8, 2015) at 1. In this section, MCR stated: "The following procedure, available at Exhibit 2 to Morningstar's Form NRSRO on the 'Regulatory Disclosure' tab of its website, was used to determine these credit ratings: General Description of Credit Rating Process, July 17, 2014" and "The following methodologies, available on the 'Analysis and Considerations' tab of its website, were used to determine these credit ratings: CMBS Subordination Model, Dec. 2014; CMBS New-Issue Ratings Opinions, Dec. 2014 . . . ." *Id.* at 1–2.

**4. Internal Control Structure:** MCR also established an effective internal control structure governing its policies, procedures, and methodologies for assigning credit ratings. MCR's complete internal control structure is beyond the scope of the SEC's narrow complaint, but the complaint never alleges a deficiency in MCR's actual internal control structure, let alone a deficiency resulting in a material weakness that rendered the overall structure ineffective.

**5. Annual Exams:** The SEC conducted annual exams of MCR's records. Section 15E(p) [15 U.S.C. § 78o–7(p)]. At each annual exam, MCR made all records available to the SEC,

---

[2] In its complaint, the SEC alleges that eighteen Rule 17g–7 disclosures violate the rule. Compl. ¶ 59. MCR is providing a summary chart showing the relevant language from all disclosures was substantively identical. *See* Ex. G-1 (Rule 17g–7 Disclosures & Certifications—Summary Chart).

including its complete CMBS methodology (including the model containing the adjustments). *See* Section 15E(p)(3)(B) [15 U.S.C. § 78o–7(p)(3)(B)]. The relevant Exhibit 2 filings were also available to the SEC. The SEC does not allege that in any of these exams it ever told MCR that (1) its Exhibit 2 disclosure was deficient because it did not describe the possibility of making the adjustments in the CMBS model, or (2) that its internal control structure was deficient.

**6. *MCR's Current Status:*** MCR has not issued a CMBS credit rating using the legacy methodology and model at issue since March 21, 2017. Compl. ¶ 66. In November 2018, MCR adopted a new CMBS methodology and voluntarily retired its legacy CMBS methodology that included the relevant model. *See id.* In December 2019, MCR withdrew its registration as an NRSRO. Compl. ¶ 20. MCR completed the withdrawal of its credit ratings in October 2020 and ceased operating as a credit rating agency in November 2020.[3] The SEC does not allege that MCR currently has any operations, employees, outstanding credit ratings, or any intent to operate as a credit rating agency in the future.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" if its "well-pleaded factual allegations" support "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678–79. "[N]aked assertions devoid of further factual enhancement" and "mere conclusory statements" are not enough. *Id.* (cleaned up). A motion to dismiss should be granted where, "even if all of the allegations contained in a

---

[3] In July 2019—well after the period at issue here—MCR's parent company (Morningstar, Inc.) acquired a separate credit rating agency, DBRS, Inc. ("DBRS"). For a brief period ending in November 2020, MCR operated as a credit rating affiliate of DBRS while MCR wound down its operations. *See* Compl. ¶ 20. DBRS is a distinct legal entity, with ongoing credit rating operation and an independent NRSRO registration.

complaint are true, a claim fails as a matter of law." *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007).[4]

## ARGUMENT

**I.     MCR Complied With The Form NRSRO Instructions Requiring A "General Description" Of Its Methodologies.**

Count I alleges that MCR violated Exhibit 2's instruction to provide a "general description" of its credit rating methodologies, including a "description" of its "quantitative and qualitative models." 79 Fed. Reg. at 55,302.[5] Exhibit 2 requires information at high level of generality, to provide users of credit ratings with "an understanding of the nature of the credit rating agency." 72 Fed. Reg. at 33,575. MCR more than met that standard, as a matter of law. Knowing that, the SEC attempts to transform Exhibit 2 into an all-purpose requirement that credit rating agencies disclose "material" or "central" details of individual credit rating models, such that MCR should have disclosed that one of its specific models included a component that allowed adjustments to the base-level stresses in the model. Compl. ¶¶ 5, 39, 44. Count I fails as a matter of law for three reasons. *First*, as relevant here, the instruction requires only a general description of all methodologies, including a description of MCR's models. 79 Fed. Reg. at 55,302. The instructions do not require credit rating agencies to describe any specific details about an individual model, even allegedly central or material details. *Second*, documents the

---

[4] On a motion to dismiss, the Court may consider documents cited in the complaint, materials incorporated into the complaint by reference, documents integral to the complaint, as well as documents it may take judicial notice of (including records filed with the SEC). *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). "This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements." *Id.* All of MCR's filings with the SEC in this case are properly considered on a motion to dismiss, both as public records and as incorporated into the SEC's complaint. *See, e.g.*, Compl. ¶¶ 4, 5, 8, 12, 34–43, 45.

[5] Section 15E(b)(2)(A) provides that a registered credit rating agency must "certify[ ] that the information and documents" in its application are "accurate." [15 U.S.C. § 78o–7(b)(2)(A)]. And Rule 17g–1(f) merely requires a credit rating agency to file an annual update to its Form NRSRO "that follows all applicable instructions for the Form." This count is thus nothing more than a claim that MCR failed to follow the instructions for Exhibit 2.

Court can consider on this motion confirm that MCR satisfied the "general description" requirement. *Third*, if adopted, the SEC's expansive reading of Exhibit 2's instructions violates due process and fails to be narrowly tailored, as Congress required.

> **A.      The SEC does not plausibly plead that MCR failed to provide a general description of its credit rating methodologies.**

The SEC alleges that MCR failed to meet the requirements of Exhibit 2 only because it failed to disclose that its CMBS model included the two adjustments. But that level of disclosure is not required by the text, structure, history, or purpose of the instructions.

*1. Text:* Statutes and regulations must be given their "ordinary, contemporary, common meaning." *Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 455–56 (2d Cir. 1999) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *Comm'r v. Soliman*, 506 U.S. 168, 174 (1993) ("[W]e look to the 'ordinary, everyday senses' of the words."), *superseded by statute on other grounds*. The instructions to Exhibit 2 require a credit rating agency to provide a "general description" of its "procedures and methodologies" that is "sufficiently detailed to provide users of credit ratings with an understanding of the processes employed . . . in determining credit ratings, including, as applicable, descriptions of" several items, one of which is a "description" of "quantitative and qualitative models" used. 79 Fed. Reg. at 55,302.

The phrase "general description" and the word "description" are common, everyday words that require a high-level summary, not a comprehensive or detailed listing of elements. Cases interpreting similar "general description" requirements make the modest nature of this requirement plain.

For example, the CFTC is required to include a "general description of the scope of [its] investigation" in any subpoena. 17 C.F.R. § 11.4(b)(1). This Court held that the following single sentence description met this requirement: "to determine whether any entity or entities listed in

Attachment A hereto (including the respondent) or any affiliates of or persons associated with any of said entities engaged in violations of [various section of the Commodity Exchange Act], or in similar acts or practices in violation of any other provisions of the [Act]." *CFTC v. First Nat'l Bullion Corp.*, 461 F. Supp. 659, 661 (S.D.N.Y. 1978), *aff'd*, 598 F.2d 609 (2d Cir. 1979). This Court did not require a list of allegedly material or central aspects of the investigation to satisfy the "general description" requirement; rather, one sentence sufficed.[6]

Similarly, Local Rule 33.3(a) restricts interrogatories to those seeking, among other things, "the existence, custodian, location and *general description* of relevant documents." S. & E.D.N.Y.R. 33.3(a) (emphasis added). This Court has never interpreted that provision to require a description of all central or material details of relevant documents. To the contrary, this Court has held that interrogatories "repeatedly violate[d]" this rule by requesting information that was far too detailed, such as "any and all clinical trials on any and all hip systems," "each and every unit tested," and "what the findings of each test were." *Rouviere v. DePuy Orthopaedics, Inc.*, No. 1:18-cv-04814 (LJL) (SDA), 2020 WL 1080775, at *2 & n.2 (S.D.N.Y. Mar. 7, 2020). Thus, in a variety of contexts, this Court has made clear that the everyday meaning of "general description" does not mean a description of each "material" or "central" item. Compl. ¶¶ 5, 44, 67.

This natural reading of the instruction is also confirmed by Exhibit 2's statement that the "description must be sufficiently detailed to provide users of credit ratings with an understanding of the processes employed by the Applicant/NRSRO in determining credit ratings." This

---

[6] *See also Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 371 (3d Cir. 1999) (stating that a one-sentence FAA regulation—"[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another"—"provide[d] a general description of the standard required for the safe operation of aircraft" (citing 14 C.F.R. § 91.13(a))); *cf. Spinello v. N.Y., N.H. & H.R. Co.*, 183 F. 762, 763–64 (2d Cir. 1910) (noting that a statute requiring a written "notice containing a general description of the injury" sought "data which will enable the railroad company to investigate and pay the damages if it sees fit").

"sufficiently detailed" clause is elaborated by a list of items that follows. 79 Fed. Reg. at 55,302–03. (the "description must be sufficiently detailed . . . including, as applicable, descriptions of" several items). The only required disclosure regarding the model is a "description" of the "quantitative and qualitative models . . . used to determine credit ratings." *Id.* at 55,302. By its own terms, there is no need to disclose each material feature in each model.  The absence of such a requirement is confirmed by the fact that the list does *not* include "material adjustments" or "material aspects" of every model, or some similar catchall. As discussed below, the purpose of this requirement is to explain the general manner in which models are used to help assign credit ratings, not to disclose every input or detail of each individual model.

Of course, if the SEC intended to require credit rating agencies to disclose all material aspects of each of their models, it could have done so. Indeed, the SEC actually did impose a materiality requirement in its instructions for other exhibits in the Form NRSRO: the instructions for Exhibit 6 require credit rating agencies to identify "the types of conflicts of interest . . . that are *material* to the Applicant/NRSRO" and to "briefly describe any other type of conflict of interest . . . that is not covered in the descriptions below *that is material*." 79 Fed. Reg. at 55,304 (emphasis added). The SEC requires disclosure of "material" information in many other rules too. *See* 17 C.F.R. § 229.1111(a)(2) ("Provide . . . [a] general description of the *material* terms of the pool assets." (emphasis added)); 17 C.F.R. § 229.402(e)(1) ("Provide a narrative description of any *material* factors necessary to an understanding of the information disclosed in the tables required . . . [in] this Item." (emphasis added)).[7] But the SEC chose not to do so here. As the Supreme Court has explained, when statutes or regulations "include[ ] particular language" like

---

[7] 17 C.F.R. § 229.1114(a) ("Include a description of the *material* terms of any enhancement or support described, including any limits on the timing or amount of the enhancement or support or any conditions that must be met before the enhancement or support can be accessed." (emphasis added)); 17 C.F.R. § 240.14a (Item 12(e) ("Outline briefly any other material features of the proposed modification or exchange.")).

materiality "in one section . . . but omit[ ] it in another . . . it is generally presumed that Congress [or the regulator] acts intentionally." *Russello v. United States*, 464 U.S. 16, 23 (1983).

*2. History:* The history of Exhibit 2 confirms that the rule does not require disclosure of all material features in each model. As previously explained, the SEC actually considered and then rejected requiring such an expansive requirement. *See* 72 Fed. Reg. at 33,575; *see United v. Matthews*, 787 F.2d 38, 47 (2d Cir. 1986). The SEC decided not to require the disclosure of "each actual procedure and methodology," and instead modified the instructions to require only a general *description* of the "procedures and methodologies (not the submission and disclosure of each actual procedure and methodology)," because "disclosing all the procedures could be burdensome and could result in an overload of information that would be less helpful to users of credit rating." 72 Fed. Reg. 33,575. For those reasons, "rather than require these procedures and methodologies to be attached to Form NRSRO and disclosed publicly," the SEC "requir[ed] that they be documented internally." *Id.* at 33,585. The SEC's litigation position is in direct contradiction to its prior rulemaking.

*3. Structure:* The structure of the entire regulatory regime reinforces the text's ordinary meaning and makes clear that Exhibit 2 requires disclosure sufficient to allow the reader to generally understand the NRSRO's overall credit rating process, not disclosure of all detailed inputs and adjustments in each and every model. After notice-and-comment rulemaking, the SEC reached a carefully considered approach that required credit rating agencies to "make and retain . . . complete and current" versions of each of their methodologies and models for inspection by the SEC, Rule 17g–2(a)(6) [17 C.F.R. § 240.17g–2(a)(6)], but to provide only a single "general description of the . . . methodologies used" including a "description" of the quantitative models, 72 Fed. Reg. at 33,634. The SEC's current attempt to graft a requirement that the disclosure

include a description of all possibly material inputs and adjustments to inputs used in every one of an NRSRO's models would eviscerate this carefully considered regulatory balance.

**4. Purpose:** Finally, the SEC's interpretation contradicts the stated purposes of the Exhibit. The adopting release for Form NRSRO explains: "The Commission believes that the information [in Exhibit 2] about any procedures and methodologies established . . . will be useful to users of credit ratings," and "will provide them with. . . an understanding of the nature of the credit rating agency (*i.e.*, a user of quantitative models, qualitative analysis, or a combination of both) and how the credit rating agency produces credit ratings." *Id.* at 33,575. This high-level, general information-gathering purpose (*e.g.*, use of quantitative versus qualitative models) cannot be squared with the SEC's argument that the instructions require credit rating agencies to disclose granular details of individual models.

**B.     MCR's "general description" of its methodologies and models was sufficient as a matter of law.**

Count I should also be dismissed because documents the Court can consider on this motion show that MCR did provide a "general description" of its methodologies. MCR's descriptions were sufficiently detailed to allow a user to understand MCR's methodologies because they described the items in the instruction, including MCR's CMBS model.

First, MCR provided a general description of its procedures and methodologies to assign credit ratings. In each Exhibit 2, consistent with the instruction, MCR included section headings for each category of information listed in the instructions, and under each heading, MCR provided the required descriptive information. *Compare* Ex. A (Ex. 2 to Form NRSRO, filed Mar. 30, 2015), *and* Ex. B (Ex. 2 to Form NRSRO, filed Mar. 30, 2016), *with* 79 Fed. Reg. at 55,302–03. For example, under the second heading, "Information Used in the Credit Rating Process," MCR described the information used and directed readers to further information on its

16

public website, including each of its narrative methodology documents. *See* Exs. A, B. MCR then made available on its website its "CMBS New-Issue Ratings Opinions" paper (Ex. C) that provided a multi-page description of the methodology. This is enough to comply with this straightforward instruction.

Second, the documents incorporated into the complaint show that MCR provided an extensive description of its "Quantitative and Qualitative Models." Under this section in Exhibit 2, MCR incorporated its CMBS Subordination Model white paper that was available on its public website. *See* Ex. E (CMBS Subordination Model white paper, Dec. 2014); Ex. F (CMBS Subordination Model white paper, Dec. 2015). Both of these 15-page white papers described "the basic concepts underlying the model and detail[ed] its primary features." *Id.* This Court has held that a one-sentence description is a sufficient general description, so a 15-page narrative description is certainly enough. *See First Nat'l Bullion Corp.*, 461 F. Supp. at 661.

Other SEC instructions that call for a "general description" make clear that MCR's extensive documentation was more than sufficient as a matter of law to satisfy the requirement. For example, in the instructions to a form for large traders (called Form 13H), SEC regulations require a "general description of [the large traders] trading strategies." *Information Required of Large Traders Pursuant to Section 13(h) of the Securities Exchange Act of 1934*, Form 13H, Instructions, Item 1. The instructions for Form 13H then state: "As an example the following would be an *appropriate* description: 'Registered market-maker on [SRO], authorized participant for a number of ETFs based on foreign indices, and proprietary trading focusing on statistical arbitrage.'" *Id.* (emphasis added) (brackets in original).

### C.    The SEC's expansive reading of Exhibit 2's instructions violates due process.

"Th[e] requirement of clarity in regulation is essential to the protections provided by the Due Process Clause . . . ." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The

Due Process Clause mandates that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id.* This constitutionally-mandated "fair notice" "requires the invalidation of laws that are impermissibly vague"—that is, statutes or regulations that "fail[ ] to provide a person of ordinary intelligence fair notice of what is prohibited, or [are] so standardless that [they] authorize[ ] or encourage[ ] seriously discriminatory enforcement." *Fox*, 567 U.S. at 253; *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1333–34 (D.C. Cir. 1995) ("a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations" where "the regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements").

The Second Circuit has routinely held that due process requires that regulations "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and that courts therefore must not "defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996); *see Matthews*, 787 F.2d at 49 (due process is denied "[w]hen a person of ordinary intelligence has not received fair notice that his contemplated conduct is forbidden"). In *Upton*, for example, the court held that due process prevented the SEC from enforcing its interpretation of a rule when "there was substantial uncertainty in the Commission's interpretation," which meant that Upton "was not on reasonable notice" that his conduct might violate the rule. 75 F.3d at 98.

Accepting the SEC's interpretation outlined in the complaint would violate due process because Exhibit 2's instructions do not put any reasonable credit rating agency on notice that it would need to disclose each aspect of every one of its models that the SEC considers "material."

Instead, a reasonable person would believe—as the rule states—that a general description of the methodologies, including a description of the items listed in the "sufficiently detailed" clause, would be sufficient. The SEC never stated—in the instruction or in any guidance or policy statement—that every central or material feature of each model must be included. Even if the Court were to disagree and accept the SEC's atextual interpretation, there was surely "substantial uncertainty in the Commission's interpretation" of the rule, which means MCR "was not on reasonable notice" of the requirement. *Upton*, 75 F.3d at 98. Accordingly, enforcing that interpretation, unveiled for the first time in an enforcement action, would violate MCR's due process rights. *Id.*; *see Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156–57 (D.C. Cir. 1986). And here, Congress specifically mandated that the SEC's regulations "shall be narrowly tailored to meet the requirements of this chapter." Section 15E(c)(2) [15 U.S.C. § 78o–7(c)(2)].

Further deepening the fair notice problem, the SEC annually inspected MCR's records, Section 15E(p)(3) [15 U.S.C. § 78o–7(p)(3)], so it had access to MCR's Exhibit 2 filings and its "complete and current" record of its entire CMBS methodology and model that contained the adjustments, Rule 17g–2(a)(6) [17 C.F.R. § 240.17g–2(a)(6)]. But the SEC does not allege that it told MCR during these exams that it needed to disclose in Exhibit 2 specific adjustments that were part of individual models. Instead, just like in *Upton*, the SEC has brought this enforcement action *years* after becoming "aware" of the conduct at issue and having "t[aken] no steps to advise the public that it believed the practice was" unlawful. 75 F.3d at 98. As the Second Circuit stated, the "Commission may not sanction [a company] pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public." *Id.*[8]

---

[8] *See also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012) ("[W]here, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute."); *see Gen. Elec.*, 53 F.3d at 1329 ("[W]e must ask whether the regulated party received, or

If the SEC wants to change its Exhibit 2 instructions to require more than a "general description," such as disclosure of all "material" information, it can do so through notice-and-comment rulemaking.  But the Court should reject the SEC's attempt to retroactively impose additional obligations through an enforcement proceeding.

## II.     The SEC Does Not Plausibly Plead That MCR Failed To Identify The Version Of The Methodology It Used In Particular Ratings.

In Count II, the SEC alleges that MCR "failed to disclose the version of the methodologies used" to determine credit ratings because it "omitted the 'loan-specific' stress adjustments from [MCR's] disclosed methodologies." Compl. ¶ 74 (citing Rule 17g–7(a)(1)(ii)(B)). This claim is baseless.

Rule 17g–7(a)(1)(ii)(B) required that MCR, with each security rating, identify "[t]he version of the procedure or methodology used to determine the credit rating." [17 C.F.R. § 240.17g–7(a)(1)(ii)(B)]. The SEC has explained that this rule is satisfied by "identifying the name of the procedure or methodology, the date the procedure was implemented, and a hyperlink to further information about the procedure or methodology." 79 Fed. Reg. at 55,169. The rule does not require the disclosure of any detail or information about that methodology, or even a "general description" of the methodology. The rule requires simple identification. *Id.*

The documents incorporated into the complaint show that MCR complied with the rule. With each MCR-rated CMBS transaction, MCR issued a "Rule 17g–7 Disclosures and Certification." *See* Compl. ¶¶ 56–57, 59; Ex. G-2 (Rule 17g–7 Disclosures & Certification,

should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations.").

CGCMT 2015-GC31, July 8, 2015).[9] Each disclosure included the section entitled "[v]ersion of the procedure or methodology used to determine the credit rating" and identified the following:

> The following procedure, available at Exhibit 2 to Morningstar's Form NRSRO on the "Regulatory Disclosure" tab of its website, was used to determine these credit ratings:
> - General Description of Credit Rating Process, July 17, 2014
>
> The following methodologies, available on the "Analysis and Considerations" tab of its website, were used to determine these credit ratings:
> - CMBS Subordination Model, Dec. 2014
> - CMBS New-Issue Ratings Opinions, Dec. 2014

Ex. G-2 (Rule 17g–7 Disclosures & Certification, CGCMT 2015-GC31, July 8, 2015) at 1.

The SEC asserts that these identifications were insufficient solely because the cited documents (which included the model description) did not expressly describe the adjustments. Compl. ¶ 74. But that is irrelevant under this rule. Rule 17g–7 has *no* requirement to disclose *any* detail about the methodology or even to provide a description of the methodology. The SEC's Claim II tries to pretend that MCR's methodology was something other than what it was.[10] Nothing more was required beyond exactly what MCR did here—identify the version of its methodology that it used. Count II should therefore be dismissed for failure to state a claim.

## III.    The SEC Does Not Plausibly Plead That MCR Failed To Have An Effective Internal Control Structure.

Count III alleges that MCR "lacked effective internal controls to ensure that its analyst[s] employed the 'loan-specific' adjustments for loan-specific reasons" and it provided no written

---

[9] Ex. G-1 (Rule 17g–7 Disclosures & Certifications—Summary Chart). All disclosures were identical, except updated reflecting the current version of the relevant methodology documents.

[10] The SEC's own complaint alleges that MCR's methodology included the loan-specific adjustments. Compl. ¶ 5 ("[MCR's] CMBS rating methodology permitted its analysts to adjust those stresses on a 'loan-specific' basis in the Subordination Model."). And the complaint does not contend that MCR failed to keep a complete record of its methodology, as required by Rule 17g–2(a)(6) [17 C.F.R. § 240.17g–2(a)(6)].

criteria "for how, why, or when to make" these adjustments. Compl. ¶ 10. But even accepting this allegation as true, the SEC has pleaded no violation of the statute.

To begin, Section 15E(c)(3)(A) requires NRSROs to "establish . . . an effective internal control *structure* governing the implementation of and adherence to . . . methodologies for determining credit ratings." [15 U.S.C. § 78o–7(c)(3)(A) (emphasis added)]. While the SEC has identified factors that an NRSRO must consider in establishing its internal control structure, *see* Rule 17g–8(d) [17 C.F.R. § 240.17g–8(d)], the SEC did "not mandat[e] that a specific factor be implemented," 79 Fed. Reg. at 55,099. The SEC has also promulgated specific regulations that define when an internal control structure is ineffective. Thus, in order to allege a violation of the internal control structure requirement, the SEC must allege that the overall internal control structure was ineffective as defined by the regulations. It does not.

The SEC makes no factual allegations about the effectiveness of MCR's overall internal control structure at all. Instead, the SEC alleges only that MCR did not have a specific control over the two adjustments. No statute, rule, or regulation required a credit rating agency to have specific controls over any individual components of its methodology, as the SEC has acknowledged. *See id.*[11] Thus, this count fails to state a claim.

Even if the complaint could be read to make allegations about MCR's overall internal control structure, it does not allege that it is "not effective" under SEC rules. Regulations provide that an internal control structure is "not effective" if it has a "material weakness." *See* Rule 17g–3(a)(7)(ii) [17 C.F.R. § 240.17g–3(a)(7)(ii)]. A material weakness is a "deficiency" or "combination of deficiencies" that creates a "reasonable probability" that an NRSRO would fail to implement or adhere to its methodology in a way that would be material and would not be

---

[11] Mandating a specific control would violate the prohibition in Section 15E(c)(2).

prevented or detected on a timely basis. Rule 17g–3(a)(7)(iv) [17 C.F.R. § 240.17g–3(a)(7)(iv)]. In turn, a deficiency exists when "the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect a failure of the [NRSRO] to" implement or adhere to its methodology. Rule 17g–3(a)(7)(iii) [17 C.F.R. § 240.17g–3(a)(7)(iii)].

The SEC never alleges that MCR's internal control structure was ineffective under these definitions. First, the SEC does not allege that MCR ever actually departed from its methodology. At most the complaint alleges that a departure was possible. Second, there are no allegations that MCR's internal control structure failed to prevent or detect any departures. Third, the SEC does not allege a failure of MCR's internal control structure created a reasonable probability that any departure would have been material. While the SEC does allege that the adjustments were material to the model, it never alleges a departure from the methodology that was material—indeed, it never alleges any departure from the methodology. Thus, the Complaint does not state a claim under the SEC's own rules that the internal control structure was ineffective.

At bottom, the SEC's complaint that MCR did not have "criteria for how, why, or when" analysts made qualitative adjustments inside its model, Compl. ¶ 62, is not a complaint about the internal control structure at all. Rather, it is an attempt to regulate the substance of MCR's old methodology. The discretion built into MCR's model through the qualitative adjustments was a feature, not a bug. By attempting to mandate substantive limits on MCR's analytical process and independence, the SEC is attempting to do what Congress has prohibited: regulate the "methodologies by which any [NRSRO] determines credit ratings." Section 15E(c)(2) [15 U.S.C.

§ 78o–7(c)(2)].[12] The SEC cannot regulate the substance of MCR's old CMBS methodology under the guise of regulating MCR's internal control structure.

## IV.     The Court Should Dismiss The Claim For Injunctive Relief.

Even apart from its other fatal deficiencies, the complaint's request for an injunction should be dismissed now. There is no basis to obtain an injunction against a former NRSRO, like MCR, because the NRSRO rules no longer apply to it and therefore it is legally impossible for MCR to commit a future violation of those rules. The SEC has not alleged facts plausibly showing that MCR will ever be subject to the NRSRO rules again, let alone violate them.

Injunctive relief is warranted only where the SEC "demonstrate[s] that there is a substantial likelihood of future violations of illegal securities conduct." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *see SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). The SEC must show "that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *SEC v. American Bd. of Trade, Inc.*, 751 F.2d 529, 537 (2d Cir. 1984) (Friendly, J.). While courts do not often "dismiss a prayer for injunctive relief" at a preliminary stage of the litigation, "since determining the likelihood of future violations is *almost* always a fact-specific inquiry," no factual inquiry is needed here because the Complaint itself makes clear that there is no likelihood of a future violation. *United States v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (emphasis added), *rev'd on other grounds*, 568 U.S. 442 (2013).

There is no possibility of a future violation here because the statutory rules and regulations that the SEC alleges were violated can be violated *only* by a credit rating agency that

---

[12] Because the SEC's position that a specific control over each adjustment was required has never been previously disclosed and is not apparent from the statute, it also violates due process. *See supra* Part I.C; *SmithKline*, 567 U.S. at 155–56 (stating that "fair warning" is absent where an agency's interpretation is "plainly erroneous or inconsistent with the regulation" or appears to be "nothing more than a 'convenient litigating position'").

is subject to the SEC's oversight of NRSROs. *See* Section 15E(a)(1)(A) [15 U.S.C. § 78o–7(a)(1)(A)] (applying statute and rules only to a "credit rating agency that elects to be treated as a[n] [NRSRO] for purposes of this chapter"). MCR is not registered as an NRSRO, is no longer a credit rating affiliate of an NRSRO, Compl. ¶ 20, no longer assigns credit ratings, and no longer operates as a credit rating agency. Therefore, MCR is no longer subject to any statute or rule cited in the complaint. MCR cannot violate these rules going forward.

Despite a multiyear investigation, the SEC does not allege *any* facts—even upon information and belief—showing that this will change. The SEC does not allege that MCR will register as an NRSRO, that it will become a credit rating affiliate of one, that MCR will ever assign a credit rating again, or that if it does, it will use the retired methodology at issue. In fact, the SEC does not allege that MCR has any employees or conducts any business at all (because it does not).[13] On the facts alleged here, a future violation is not just unlikely but impossible as a matter of law. Without "a real threat of future harm, there is in fact no lawful purpose to be served by a preventive injunction." *SEC v. Fowler*, 440 F. Supp. 3d 284, 300–01 (S.D.N.Y. 2020) (cleaned up), *appeal docketed*, No. 20-1081 (2d Cir. Mar. 26, 2020); *see also SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) ("SEC [must] go beyond the mere facts of past violations" to obtain an injunction); *SEC v. Gentile*, 939 F.3d 549, 560 (3d Cir. 2019) (same, collecting cases). The SEC's request for an injunction should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the complaint with prejudice.

---

[13] Instead, the SEC makes only three identical conclusory allegations for each count: "Unless enjoined, [MCR] will again violate" the provisions at issue. Compl. ¶¶ 72, 75, 78. These are mere labels and conclusions that are insufficient to show "that there is a substantial likelihood of future violations of illegal securities conduct." *Cavanagh*, 155 F.3d at 135; *see Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' . . . 'will not do.'"); *see also SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 18 (2d Cir. 1977) ("[T]he Commission cannot obtain relief without *positive proof* of a reasonable likelihood that past wrongdoing will recur." (emphasis added)).

April 19, 2021

Respectfully submitted,

/s/ Benjamin M. Mundel
Stephen L. Cohen
David S. Petron
Christopher R. Mills
Benjamin M. Mundel
Cody L. Reaves
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005
Tel.:  (202) 736-8000
Fax:  (202) 736-8711
bmundel@sidley.com

*Counsel for Defendant Morningstar Credit
Ratings, LLC*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2021, I caused a copy of this document to be filed using

the CM/ECF system, which will provide notice to all registered counsel.

<u>/s/ Benjamin M. Mundel</u>
Benjamin M. Mundel
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005
Tel.:  (202) 736-8000
Fax:  (202) 736-8711
bmundel@sidley.com