| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | USDC-SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC#:<br>DATE FILED: 01/05/2022 |

U.S. SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

                v.

MORNINGSTAR CREDIT RATINGS, LLC,

                Defendant.

No. 21-cv-1359 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

      Plaintiff U.S. Securities and Exchange Commission ("the SEC") brought this action against Morningstar Credit Ratings, LLC ("MCR"), which formerly operated as a nationally recognized statistical ratings organization ("NRSRO")—otherwise known as a credit rating agency. The SEC alleges that MCR violated federal securities laws and regulations promulgated thereunder that govern the conduct of NRSROs. MCR moves to dismiss the SEC's Complaint for failure to state a claim. For the reasons that follow, MCR's motion is granted in part and denied in part.

## BACKGROUND

**I.    Statutory Framework**

      Congress authorized the SEC to establish a registration and oversight program for credit rating agencies in the Credit Rating Agency Reform Act of 2006 ("the Act"). The Act imposed certain registration and certification requirements for NRSROs. *See* 15 U.S.C. §§ 78o–7(a)-(b). Under the Act, prospective NRSROs must submit to the SEC "information regarding . . . the procedures and methodologies that the [prospective NRSRO] uses in determining credit ratings" and must annually recertify that information; they must also make that same information "publicly

available on [the NRSRO's] website" or through comparable means. *Id.* §§ 78o–7(a)(1)(B)(ii); 78o–7(b)(2); 78o–7(a)(3). In 2007, the SEC promulgated rules to implement this registration and certification program. *See Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations*, 72 Fed. Reg. 33,564-01 (June 18, 2007).

Among those rules is Exchange Act Rule 17g–1. Rule 17g–1 requires that NRSROs' initial applications for registration, updates of registration, and annual certifications be filed using a specified form that "follows all applicable instructions for the Form." 17 C.F.R. § 240.17g–1(a), (e), (f). As detailed in the SEC's published notice of the final rule, one of these applicable instructions directs NSRSOs to include in their registrations and certifications a "general description of the procedures and methodologies used by the Applicant/NRSRO to determine credit ratings." 72 Fed. Reg. at 33,634. This general description "must be sufficiently detailed to provide users of credit ratings with an understanding of the processes employed by the Applicant/NRSRO in determining credit ratings," and must include, among other information, any applicable descriptions of "the quantitative and qualitative models and metrics used to determine credit ratings." *Id.*; *see id.* at 33,575 (reiterating this standard when commenting on the Form's requirements). One of the SEC's stated purposes for requiring disclosures of these descriptions is to "provide a basis for comparing NRSROs." *Id.* at 33,575. There is no dispute that the regulations direct adherence to these instructions, *see* 17 C.F.R. § 240.17g–1, and that these instructions "have the force of law, having been issued . . . following a notice and comment period." *U.S. SEC v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 417 (S.D.N.Y. 2018).

Rule 17g–1 further provides that each NRSRO shall make its general description of these procedures and methodologies "publicly and freely available on an easily accessible portion of its" website. 17 C.F.R. § 240.17g–1(i). A related regulation requires each NRSRO to make and retain

complete records of the procedures and methodologies it uses to determine credit ratings. *Id.* § 240.17g–2(a)(6). In its notice, the SEC explained that it required only general descriptions to be publicly disclosed because "disclosing all the procedures could be burdensome and could result in an overload of information that would be less helpful to users of credit ratings." 72 Fed. Reg. at 33,575.

Pursuant to 2010 amendments to the Act, NRSROs must also disclose to users of credit ratings "the version of a procedure or methodology, including the qualitative methodology or quantitative inputs, used with respect to a particular credit rating." 15 U.S.C. § 78o–7(r)(3)(a). The SEC thereafter promulgated a rule requiring NRSROs to disclose the "version of the procedure or methodology used to determine [a particular] credit rating" contemporaneously with the publication of that rating. 17 C.F.R. § 240.17g–7(a)(1)(ii)(B).

After the 2008 financial crisis, Congress strengthened the SEC's oversight of NRSROs by requiring NRSROs to "establish, maintain, enforce, and document an effective internal control structure governing the implementation of and adherence to policies, procedures, and methodologies for determining credit ratings." 15 U.S.C. § 78o–7(c)(3)(A).

**II.   Factual and Procedural Background**

The following facts are drawn from the SEC's Complaint and are presumed to be true for purposes of resolving this motion. The Court also considers documents submitted with the parties' briefing that were either incorporated by reference into the SEC's Complaint or filed with the SEC and thus subject to judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider . . . documents incorporated by reference in the complaint."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice

3

of the contents of relevant public disclosure documents required to be filed with the SEC.").

MCR formerly operated as an NRSRO.[1]  Compl. ¶ 20.  At issue are MCR's ratings of dozens of commercial mortgage-backed securities ("CMBS") in 2015 and 2016, which were collectively worth approximately $30 billion.  *Id.* ¶ 4.

In compliance—it contends—with the statutory and regulatory disclosure requirements, MCR made publicly available two types of documents that described its rating methodology: a paper titled "CMBS New-Issue Ratings Opinions," which provided a short overview of MCR's methodology, and a longer paper titled "CMBS Subordination Model," which provided a more detailed description of the methodology.[2]  The first document explained that MCR "employ[ed] a bottom up quantitative analysis approach typically beginning with an analysis of a representative sample of the loans collateralizing the CMBS" and then applied "extrapolated stresses . . . to the balance of the loans in the portfolio."  Dkt. 22-3 at 4.  "The results of the analysis of each loan, and the loan terms and property characteristics of each loan, [were] then input into [MCR's] proprietary new issuance CMBS subordination model."  *Id.*  The second document, which described that subordination model, stated that it detailed the model's "primary features."  Compl. ¶¶ 4, 5, 34; Dkt. 22-5 ("CMS Subordination Model") at 4.  According to the CMBS Subordination Model, MCR first assessed a representative sample of the commercial real estate loans collateralizing a CMBS transaction in order to determine (1) the expected net cash flow that each property would generate over the life of the loan and (2) the value of each property and associated "capitalization rate for each loan."  *See* Compl. ¶ 35; CMBS Subordination Model at 4-10.  MCR then subjected these two values to defined sets of stresses to estimate the probability of default and

---

[1] MCR effectively ceased operating as an NRSRO after November 2020.  Compl. ¶ 20.

[2] The record contains two versions of each of these documents, one dated 2014 and one dated 2016.  Because the two sets of documents are functionally identical, the Court cites to the 2014 documents for simplicity.

4

likelihood of recovery in the event of default.  CMBS Subordination Model at 4-10.  The loan-level estimated losses that resulted from those stresses were then used to determine the requisite subordination level for the rating—that is, the "percentage of the total CMBS certificates issued in the transaction that are rated below a given class of CMBS."  Compl. ¶ 32.  Subordination levels were "[t]he key determinant of ratings."  *Id.*

Two stresses in MCR's methodology are particularly relevant here: the Base Net Cash Flow Stress (the "Base NCF Stress") and the Base Capitalization Rate Stress (the "Base Cap Rate Stress").  The Base NCF Stress "imposed defined sets of stresses to account for potential declines in net cash flows, such as reduced rental payments for the properties securing the loans."  *Id.* ¶ 37; *see* CMBS Subordination Model at 8-10.  The severity of the Base NCF Stress depended on the ratings category of a given loan and on the category of property securing the loan.  Compl. ¶ 37.  MCR's description of this stress in its CMBS Subordination Model did not suggest that application of the stress had any capacity for discretionary adjustment.  Similarly, the Base Cap Rate, which valued the properties securing the underlying mortgage loans, was stressed to mimic the effects of various economic environments.  *See id.* ¶ 38.  According to MCR, "higher rating categories [were] stressed with a higher cap rate adjustment," which "result[ed] in more severe principal losses at the higher rating categories."  CMBS Subordination Model at 9.  The description of this stress also says nothing about the possibility of a discretionary adjustment on top of this adjustment.

The SEC alleges that MCR's publicly available CMBS Subordination Model—which purported to contain all the "primary features" of MCR's rating methodology—failed to disclose what MCR elsewhere described as a "central feature" of that methodology: that analysts could make discretionary, loan-level adjustments to the Base NCF Stress and the Base Cap Rate Stress.  Compl. ¶¶ 39-44.  These discretionary adjustments could apparently be made "for subjective

5

reasons," including in order to bring a transaction's credit rating "in line with expectations based on similar deals." *Id.* ¶ 11. According to the SEC, these undisclosed adjustments were applied to each of the CMBS at issue. *Id.* ¶ 45. The adjustments "were overwhelmingly used to ease [the Base NCF and Base Cap Rate] stresses," which lowered expected losses, thus allowing MCR to assign transactions higher credit ratings than it would have been able to without the application of those adjustments. *Id.* ¶¶ 6-7, 47-48 ("Ultimately, [MCR's] easing of the disclosed net cash flow and capitalization stresses resulted in materially higher [MCR] ratings for hundreds of millions of dollars' worth of CMBS certificates."). In fact, MCR allegedly used these adjustments to rate some CMBS "as investment-grade securities, when [MCR] would have rated those securities as below-investment-grade had [MCR] rated the CMBS in accordance with its disclosed methodology." *Id.* ¶ 8. According to the SEC, MCR's failure to disclose these adjustments in its public descriptions of its methodology meant that "investors were not able to adequately assess the ratings determined by [MCR] and their associated risk." *Id.* ¶ 49.

The SEC also alleges that MCR failed to establish and enforce an effective internal control structure ensuring that these undisclosed adjustments were applied in accordance with MCR's policies and methodologies. Specifically, MCR's methodology did not contain any criteria dictating "how, why, or when to make" these loan-specific adjustments. *Id.* ¶ 10. Thus, although MCR described these adjustments as "loan-specific" and "case-by-case," analysts apparently applied them to entire portfolios or entire ratings categories and "for reasons having nothing to do with a specific loan, such as to nudge a rating produced by the model to align with expectations" based on similar previous transactions. *Id.* ¶¶ 10, 12, 43.

The SEC contends that through these actions, MCR violated three separate federal securities laws and regulations governing NRSROs: (1) the requirement that NRSROs make

publicly available a general description of the procedures and methodologies used to determine credit ratings that is sufficiently detailed to provide users of credit ratings with an understanding of the processes employed to determine those ratings; (2) the requirement that NRSROs identify the version of the methodology used to determine an individual credit rating; and (3) the requirement that NRSROs establish, maintain, and enforce an effective internal control structure ensuring implementation of and adherence to rating methodologies.  *Id.* ¶¶ 9, 55, 59, 63.  The SEC requests relief in the form of civil monetary penalties; an order for MCR to disgorge the profits gained as a result of these alleged actions; and a permanent injunction prohibiting MCR from violating securities laws in the future.  *Id.* ¶ 16.

Pursuant to the authority conferred to it under the Act, *see* 15 U.S.C. § 78u, the SEC filed the Complaint in this action on February 16, 2021.  After MCR's motion to dismiss was fully briefed, the Court heard oral argument on December 20, 2021.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.*; claims that are merely "conceivable" or "consistent with" liability are insufficient, *Twombly*, 550 U.S. at 545, 570.  In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir.

2008). The Court need not, however, credit "threadbare recitals of the elements of the cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.[3]

## DISCUSSION

The Court begins by noting that—as far as it is aware—the statutes, regulations, and instructions at issue have not been interpreted in any prior litigation.[4] Nevertheless, ordinary principles of interpretation apply: first examining the plain text, and if that text proves ambiguous, then turning to interpretative canons. *See Green v. Brennan*, 578 U.S. 547, 553-54 (2016).

**I.    The SEC Has Plausibly Alleged that MCR Failed to Provide a General Description of Its Credit Rating Methodology**

To implement the statutory mandate that NRSROs annually "certify[] that the information and documents in the application for registration . . . continue to be accurate," 15 U.S.C § 78o–7(b)(2)(A), SEC regulations require that NRSROs "file with the Commission an annual certification on Form NRSRO that follows all applicable instructions for the Form," 17 C.F.R. § 240.17g–1(f). That Form instructs agencies to make publicly available a "general description" of its methodology that is "sufficiently detailed to provide users of credit ratings with an understanding of the processes" employed to determine credit ratings. 72 Fed. Reg. at 33,634. The parties' first dispute centers not on the meaning of any language in the relevant statute or regulation, but on the meaning of "general description" as that term is used in the Form's instructions. The SEC claims that MCR's "omission of any reference to the 'loan-specific' stress adjustments . . . prevented users of credit ratings from understanding [MCR's] process for

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

[4] The SEC has published one notice of settlement in which the SEC expressed a similar interpretation of 15 U.S.C. § 78o–7(c)(3)(A) and associated regulations. *See In the Matter of Kroll Bond Rating Agency, LLC*, SEC Release No. 90036 (Sept. 29, 2020), https://www.sec.gov/litigation/admin/2020/34-90036.pdf. This interpretation was not reviewed by a court.

determining CMBS ratings."  Compl. ¶ 55.  MCR counters that its published description of its methodology qualifies as a "general description" even without mentioning those two adjustments.  MCR's secondary argument is that the SEC's reading of "general description" violates due process.

The Court finds that the SEC has plausibly alleged that MCR violated its regulatory disclosure obligation by describing its rating methodology in a manner that failed to provide users with an understanding of that methodology.  MCR's interpretation of the disclosure requirement relies exclusively on the introductory term "general description," ignoring the subsequent mandate that this description be "sufficiently detailed to provide users of credit ratings with an understanding of the processes the . . . NRSRO employs to determine credit ratings."  For instance, MCR points to two cases in which courts have interpreted the phrase "general description": one in which a court determined that a one-sentence description was sufficient to support a CFTC investigatory subpoena, *see CFTC v. First Nat'l Bullion Corp.*, 461 F. Supp. 659, 661 (S.D.N.Y. 1978); and one in which a court discussed Local Rule 33.3(a)'s restriction of interrogatories to those seeking "the existence, custodian, location and general description of relevant documents," *Rouviere v. DePuy Orthopaedics, Inc.*, No. 18-cv-4814 (LJL) (SDA), 2020 WL 1080775, at *2 (S.D.N.Y. Mar. 7, 2020).  Both these sources, MCR argues, support a high-level interpretation of "general description."

But MCR fails to persuasively explain why these terms—used in very different legal contexts to describe very different subject matters—should be read *in pari materia*.  *Cf. Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("[S]tatutes addressing the same subject matter

9

generally should be read as if they were one law.").[5]  More helpful to the Court is the principle that the "plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) (statutory and regulatory language is "known by the company it keeps").  This suggests that the phrase "general description" must be interpreted in light of the additional requirement that it furnish a user of credit ratings with sufficient information to understand the process by which an agency determines its ratings.  Indeed, the SEC has explained that a primary purpose of the disclosure requirement is to communicate such an understanding to users.  *See* 72 Fed. Reg. at 33,585 (stating that a separate record-keeping requirement would "permit Commission examiners to review . . . procedures and methodologies in order to review whether the NRSRO has disclosed sufficient information about them in Form NRSRO to permit users of credit ratings to understand how the NRSRO determines credit ratings").  In this context, it becomes clear that a "general description" is defined not by its length or any other formalistic criteria, but by whether it conveys to a user an understanding of how an NRSRO determines credit ratings.  Adopting MCR's contrary "narrow construction" that functionally ignores this textual requirement would "deprive the rule in question of all serious purpose."  *Upton v. SEC*, 75 F.3d 92, 97 (2d Cir. 1996).

That standard—that a general description must be sufficiently detailed to provide users of credit ratings with an understanding of the processes the NRSRO employs to determine ratings—must then be applied to the facts alleged by the SEC.  Taking all reasonable inferences in the SEC's

---

[5] Moreover, one of the two cases on which MCR relies did not even base its ruling on whether a particular description qualified as a "general description"; rather, the court rejected proposed interrogatories under Local Rule 33.3 because they did "not relate to witness names, damages or documents." *Rouviere*, 2020 WL 1080775, at *2.

10

favor, it is plausible that a user of credit ratings would not understand how MCR determined credit ratings without knowledge of the undisclosed adjustments, in which case MCR would have failed to provide the requisite description and thus failed to follow the SEC's binding instructions. Not only were the adjustments, in MCR's own words, a "central feature" of its methodology and yet not disclosed in a document that purported to describe that methodology's "primary features," Compl. ¶¶ 39, 44, but the undisclosed adjustments allegedly undermined the adjustments that were disclosed. While the disclosed adjustments largely operated to *increase* the stresses on individual loans—thus potentially lowering the credit rating of a transaction—the undisclosed adjustments were instead largely applied to *ease* those stresses—thus potentially (and, according to the SEC, actually) increasing the credit rating of a transaction. While the disclosed adjustments were non-discretionary and determined by factors such as geography or property category, the undisclosed adjustments were instead made at an analyst's discretion and for reasons unrelated to an individual loan. And while the undisclosed adjustments were loan specific in nature, MCR's published guidance instead represented that it did not adjust any stresses at the "sub-property [type] level," suggesting that the content of MCR's disclosures went beyond omission into misstatement. *Id.* ¶¶ 6, 11, 37, 47; CMBS Subordination Model at 8. These factual allegations make it plausible that a user reading MCR's disclosures would not walk away with an understanding of MCR's rating methodology.

MCR objects to the SEC's "attempt[]" to "transform [the instructions] into an all-purpose requirement that credit rating agencies disclose 'material' or 'central' details of individual credit rating models." MOL at 11. But the question is not whether the undisclosed adjustments are material or central details; it is whether a user of credit ratings would possess an understanding of the process by which MCR produced its ratings without knowledge of those adjustments. The

11

possibility that this inquiry may overlap with a materiality inquiry does not lead this Court to the conclusion that the SEC must have used the word "materiality" in describing the regulatory requirement; as discussed above, the language the SEC chose to use establishes a standard that can be meaningfully interpreted and applied on its own terms. Like a materiality inquiry, though, this standard implicates a question of fact (what a user would need to know to "understand" a methodology) that cannot be resolved on a motion to dismiss. *Cf. In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) ("[B]ecause the materiality element presents a mixed question of law and fact, it will rarely be dispositive in a motion to dismiss."); *Alpine Secs. Corp.*, 354 F. Supp. at 431 (concluding that a question of fact existed as to whether a corporation failed to comply with published agency instructions to describe "related litigation" in a mandatory form by not describing a decade-old litigation). MCR's argument that these two adjustments are not necessary to furnish a user with that understanding may ultimately prevail. But that is an issue to be proven or disproven later in the litigation.[6]

MCR further argues that the SEC's reading violates the Due Process Clause. Due process requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996). "This principle applies . . . less forcefully . . . if the rule in question carries only civil rather than criminal penalties." *Id.* The

---

[6] MCR contends that "the SEC's opposition shifts to a new theory" from that pleaded in its Complaint because in its Complaint, the SEC alleged that MCR violated regulations by omitting critical information about its methodology, while in its opposition brief, it argued that MCR violated regulations by inaccurately describing its methodology. Reply MOL at 1. The Court finds this distinction unavailing. The SEC's core claim is that by not disclosing the discretionary adjustments, MCR failed to provide a "general description" of its methodology "sufficiently detailed to provide users of credit ratings with an understanding of the processes employed . . . in determining credit ratings." This failure could plausibly occur through omission or through misrepresentation—indeed, the same claims could plausibly be understood as alleging an omission and/or a misrepresentation. In any event, the SEC's Complaint does plead facts sufficient to support the inference that MCR's disclosed statement (that it described each "primary feature" of its rating model in its CMBS Subordination Model) was inaccurate. *See* Compl. ¶¶ 39-44 (highlighting the fact that a central feature of MCR's model was not in a document that purported to contain the model's primary features). Contrary to MCR's assertion, presenting a theory of liability in slightly different terminology does not equate to "amend[ing]" a complaint. Reply MOL at 2.

"reasonable opportunity" standard does not demand that regulations "achieve meticulous specificity"; they "may instead embody flexibility and reasonable breadth." *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999).

The Court is not persuaded at this stage that the SEC's interpretation of the "general description" required of NRSROs is so far afield from reasonable expectations that MCR did not have fair notice of what was prohibited. "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). In this case, while it may be "difficult to prove" that MCR's disclosures failed to provide users of credit ratings with an understanding of its rating methodology, it is clear that this is the factual inquiry that will ultimately determine MCR's liability. MCR also relies on cases in which courts have held that agencies' regulatory interpretations created unfair surprise because enforcement actions based on those interpretations were initiated after years of agency inaction in the face of industry-wide violations. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (concluding that a DOL interpretation regarding exempt employees created unfair surprise because "despite the industry's decades-long practice of classifying pharmaceutical detailers as exempt employees, the DOL [had] never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully"); *Upton*, 75 F.3d at 94, 98 (concluding that "substantial uncertainty" existed regarding the SEC's interpretation of a rule when the allegedly violative practice was "standard procedure" and the SEC had been aware for years that other firms were engaging in that practice). But there are no facts alleged in the SEC's

13

Complaint suggesting that MCR's practices have been widespread across the industry for years without the SEC taking any action.[7]

Accordingly, the Court denies MCR's motion to dismiss the SEC's first cause of action.

## II. The SEC Has Failed to Plausibly Allege that MCR Failed to Identify the Version of the Methodology Used to Determine Individual Credit Ratings

The Act requires NRSROs to disclose to users of credit ratings "the version of a procedure or methodology, including the qualitative methodology or quantitative inputs, used with respect to a particular credit rating." 15 U.S.C. § 78o–7(r)(3)(a). SEC regulations accordingly mandate that NRSROs identify "[t]he version of the procedure or methodology used to determine [each] credit rating" that it assigns. 17 C.F.R. § 240.17g–7(a)(1)(ii)(B). For each of the securities at issue, MCR disclosed that it used its CMBS New-Issue Ratings Opinion and its CMBS Subordination Model to rate the security and referred users to those documents on its website. The SEC contends that because those documents "failed to accurately describe[]" MCR's methodology by not disclosing the two loan-level adjustments, MCR "thus failed to accurately identify the version of its methodology it used to determine" the credit ratings for those transactions. Opp. MOL at 18; *see* Compl. ¶¶ 57-59. The SEC's theory appears to be that these two adjustments are not just necessary to understand MCR's methodology, but also effectively define the methodology such that not disclosing them amounts to failing to identify the correct methodology.

The Court finds this to be a significantly closer question than that posed by the SEC's first cause of action—and one that ultimately lands in MCR's favor. The plain text of the regulation

---

[7] MCR's theory that the SEC has unfairly changed its position because it had not previously sounded alarms following its annual examinations of MCR's records relies on a factual assumption not supported by the Complaint: that the SEC noticed the discrepancy between MCR's disclosures and its complete methodology during those examinations and deliberately failed to act on that discrepancy. Even if the SEC had been aware of that discrepancy earlier, not immediately filing suit after receiving notice of one entity's potential violations is not equivalent to ignoring an industry-wide practice for years. If MCR adduces facts during discovery that support its due process argument, it may renew that argument later in the litigation.

14

appears to require nothing more than identification of a methodology. As a matter of common sense, it seems that one could *identify* an item or procedure while failing to accurately or fully *describe* that item or procedure: identification and description are not coextensive concepts, even when it comes to critical elements necessary to understand that procedure. Moreover, in its notice of final rule, the SEC agreed with the proposition that § 240.17g–7(a)(1)(ii)(B) is satisfied by "identifying the name of the procedure or methodology, the date the procedure was implemented, and a hyperlink to further information about the procedure or methodology." *Nationally Recognized Statistical Ratings Organizations*, 79 Fed. Reg. 55,078-01, 55,169 (Sept. 14, 2014). Unlike the "sufficiently detailed" language discussed above, the requirement of providing "further information about the procedure or methodology" is not tied to any standard or goal, such as conveying an understanding of the process used to assign ratings.

In other words, neither the text of the regulation nor the SEC's commentary on it suggests that "identification" should be read to mean "fully and accurately describe," or that there is a specific amount of "further information" that is necessary to satisfy the identification requirement. The SEC's argument against dismissal rests entirely on the conclusory theory that, because MCR violated 17 C.F.R. § 240.17g–1(f), it also violated § 240.17g–7(a)(1)(ii)(B). But these are two different regulations, and the SEC does not explain why they should be read to impose the same requirements, much less do so persuasively.

Accordingly, MCR's motion to dismiss the second cause of action is granted.

### III. The SEC Has Plausibly Alleged that MCR Lacked an Effective Internal Control Structure Governing Implementation of and Adherence to Its Policies, Procedures, and Methodologies for Determining Credit Ratings

The SEC's final claim is that MCR failed to "establish, maintain, enforce, and document an effective internal control structure governing the implementation of and adherence to policies,

procedures, and methodologies for determining credit ratings." 15 U.S.C. § 78o–7(c)(3)(A). Regulations governing the contents of NRSROs' annual reports provide that an internal control structure is "not . . . effective" if it has "one or more material weaknesses." 17 C.F.R. § 240.17g–3(a)(7)(ii). "[A] material weakness exists if a deficiency, or a combination of deficiencies, in the design or operation of the internal control structure creates a reasonable possibility that a failure [of implementation or adherence] that is material will not be prevented or detected on a timely basis." *Id.* § 240.17g–3(a)(7)(iv). And "a deficiency in the internal control structure exists when the design or operation of a control does not allow management or employees . . . to prevent or detect a failure of the [NRSRO] to . . . [i]mplement a policy, procedure, or methodology for determining credit ratings in accordance with the policies and procedures of the [NRSRO]; or [a]dhere to an implemented policy, procedure, or methodology for determining credit ratings." *Id.* § 240.17g–3(a)(7)(iii).[8]

The SEC's theory is that MCR's internal control structure, such as it was, contained "material weaknesses" that led to applications of the loan-level adjustments to the transactions at issue in ways that ran afoul of MCR's policies and/or methodologies. Specifically, the SEC claims that "there were no criteria for how, why, or when to make these 'loan-specific' stress adjustments, nor did [MCR] require analysts to even document why those adjustments were made." Compl. ¶ 62. This allowed "analysts to employ supposed 'loan-specific' adjustments for reasons unrelated to the specific loans or individual properties securing those loans": for instance, "to ratchet a rating up in line with expectations." *Id.* ¶ 63. Moreover, the adjustments were allegedly applied "on a portfolio-wide basis . . . meaning that the same so-called 'loan-specific' stress adjustment was

---

[8] Because these regulations speak only to NRSROs' reporting requirements, it is not self-evident that the definition of "ineffectiveness" established in the regulations governs the determination of whether an internal control structure is ineffective in violation of 15 U.S.C. § 78o–7(c)(3)(A). However, the parties both appear to accept that these regulatory definitions determine violations of that section.

16

applied to every loan in the ratings category." *Id.* These portfolio-wide, expectation-oriented applications allegedly contravened MCR's policy that these adjustments were "loan-specific" in nature and applied on a "case-by-case" basis. *Id.* ¶¶ 12, 43, 63. And according to the SEC, MCR's annual reports during the relevant period "concluded that [its internal control structure] was 'effective'" despite these alleged weaknesses. *Id.* ¶ 67.

MCR's primary argument for dismissal of this claim is that § 78o–7(c)(3)(A)'s requirement to implement, maintain, and document an "effective internal control *structure*" governing adherence to a rating methodology, MOL at 22, does not demand effective internal controls governing adherence to each component of a rating methodology. In other words, the parts may be ineffective or nonexistent so long as the whole structure is effective. The Court finds MCR's reading unpersuasive. If a buyer discovers that her new car's engine is dead, or that its brakes are shot, she will not be appeased by a response that the car itself is not defective because the engine and brakes are merely components of the car. A control structure governing adherence to a methodology cannot be said to exist or be effective if the controls that govern adherence to the components of that methodology are themselves nonexistent or ineffective—after all, what is a control structure made of if not one or more individual controls? *See Structure*, Merriam-Webster Dictionary (defining "structure" as "the aggregate of elements of an entity in their relationships to each other" or as an "organization of parts as dominated by the general character of the whole"). Because the SEC has alleged that there were material weaknesses in MCR's internal control structure that adversely impacted MCR's implementation of and/or adherence to its policies and methodologies governing application of the loan-level adjustments, the SEC has stated a claim under § 78o–7(c)(3)(A).[9]

---

[9] In addition to disputing the SEC's interpretation of the statute, MCR also argues that the SEC failed to plead that "MCR ever actually departed from its methodology" or that "MCR's internal control structure failed to prevent or

MCR further argues that the SEC's third cause of action attempts to regulate the substance of MCR's rating methodology, which is expressly forbidden by the Act. *See* 15 U.S.C. § 78o–7(c)(2) ("[N]either the Commission nor any State . . . may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings."). According to MCR, because "[t]he discretion built into MCR's model through the qualitative adjustments was a feature, not a bug," any challenge relating to the use of the adjustments amounts to an attempt to regulate MCR's methodology. MOL at 23. But this argument overlooks the SEC's allegation that MCR analysts applied these adjustments in contravention of MCR's own policies regarding the "loan-specific" and "case-by-case" nature of the adjustments. More broadly, the statutory text that immediately follows the prohibition on regulating methodologies is the requirement that an NRSRO "establish, maintain, enforce, and document an effective internal control structure governing the implementation of and adherence to policies, procedures, and methodologies for determining credit ratings." 15 U.S.C. § 78o–7(c)(3)(A). The Act thus acknowledges that requiring the creation of an internal control structure to ensure adherence to an NRSRO's methodologies and the effectiveness of that control structure does not equate to shaping the substance of methodologies. The SEC's claim that MCR failed to establish such a structure governing application of its adjustments falls within the permissible

---

detect any departures." MOL at 23; *see* Reply MOL at 8 ("The SEC also incorrectly asserts that it pleaded facts showing that MCR applied the adjustments inconsistently with its methodology."). As an initial matter, this argument misstates the relevant standard: an internal control structure contains material weaknesses, and is thus ineffective, if "a deficiency, or a combination of deficiencies, in the design or operation of the internal control structure *creates a reasonable possibility* that a failure [of implementation or adherence] that is material will not be prevented or detected on a timely basis." 17 C.F.R. § 240.17g–3(a)(7)(iv) (emphasis added). This argument further ignores the allegations in the SEC's Complaint that MCR actually failed to adhere to its policies and methodologies by applying "loan-specific" adjustments on a portfolio-wide basis for reasons unrelated to individual loans or properties. MCR's reliance on *In re SunEdison Inc. Securities Litigation*, 300 F. Supp. 3d 444 (S.D.N.Y. 2018), in which the court stated that "[c]laims that successfully allege insufficient internal controls typically involve instances where the failure of internal controls led to restated financial results," *id.* at 470, is misplaced for similar reasons. The SEC here alleges that the application of the undisclosed loan-level adjustments led to the assignment of higher credit ratings; this plausibly includes portfolio-wide applications of those adjustments in a manner that contravened MCR's "loan-specific" policy.

boundaries of the statute: the SEC seeks not to "mandate specific controls," Reply MOL at 9, but to mandate *some* effective controls, however MCR chooses to design, implement, and adhere to them.

Accordingly, the Court denies MCR's motion to dismiss the SEC's third cause of action.

### IV. The SEC's Request for a Permanent Injunction Is Dismissed Without Prejudice

"In determining whether injunctive relief is appropriate, the critical question . . . is whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). The Court concludes that the SEC has not plausibly alleged that there is a reasonable likelihood of MCR violating the securities laws in the future. As the SEC itself recognizes, MCR is no longer operating as an NRSRO. Compl. ¶ 20. The SEC does not allege that MCR plans to renew its NRSRO registration, or that if it does, it will continue to use the same flawed disclosures and internal control structure. To be sure, "where, as here, the complaint plausibly alleges that defendants . . . violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry." *Gabelli*, 653 F.3d at 61. But this Complaint is unusual in that it is brought against an entity that no longer operates as a credit rating agency. While it may be "conceivable" that MCR will again violate the securities laws, *Twombly*, 550 U.S. at 570, the SEC has not plausibly asserted that this outcome is reasonably likely for this particular defendant.

Accordingly, the Court dismisses the request for injunctive relief without prejudice. If the SEC adduces facts supporting the assertion that MCR is reasonably likely to violate the law in the future, it may renew this request for relief later in the litigation.

## CONCLUSION

For the foregoing reasons, MCR's motion to dismiss is granted in part and denied in part. The Clerk of Court is respectfully directed to terminate the motion at docket number 20. The stay in this case is lifted. By no later than January 19, 2022, the parties shall submit an updated proposed case management plan and scheduling order.

SO ORDERED.

Dated: January 5, 2022
New York, New York

                                            Hon. Ronnie Abrams
                                            United States District Court Judge